THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
LESLIE ANNE EMICK, Appellant.

Fourth Department, November 7, 1984

644

APPEARANCES OF COUNSEL

*Walsh & Cleary, P. C. (Thomas Cleary* of counsel), for appellant.

*Patricia K. Fogerty* for respondent.

OPINION OF THE COURT

MOULE, J.

Early on the morning of February 25, 1983, in a trailer on North Shore Road in the Town of Cuba which she shared with Marshall Allison, defendant shot him in the head while he was sleeping.

She immediately called Chief Sweet of the Town of Cuba police to report the shooting. Officer Mackney of the Cuba police arrived a short time later and determined that Allison was dead. After executing a written waiver of her rights, defendant told Mackney that the decedent was the father of her two children, ages 2 and 1½. She also told Mackney that the decedent had been physically abusing her and, in fear that the abuse would continue, she killed him.

Defendant was subsequently indicted under subdivision 2 of section 125.20 of the Penal Law, which provides that a person is guilty of first degree manslaughter when: "With intent to cause the death of another person, he causes the death of such person or of a third person under circumstances which do not constitute murder because he acts under the influence of extreme emotional disturbance, as defined in paragraph (a) of subdivision one of section 125.25. The fact that homicide was committed under the influence of extreme emotional disturbance constitutes a mitigating circumstance reducing murder to manslaughter in the first degree and need not be proved in any prosecution initiated under this subdivision".

At trial, the prosecution based its case principally on the testimony of Chief Sweet, State Police Investigator Emerson, Donya Abrams, a worker at a domestic violence hotline center, and Richard Meyers, a friend of both the decedent and defendant. Defendant did not dispute the prosecutor's claim that she had shot and killed Allison; rather, based upon the pattern of physical abuse she had been subjected to by the decedent in the past and her alleged belief that he was going to kill her when he awoke, she raised the defense of justification. The defense presented three principal witnesses: Dr. Taylor from Cuba, defendant and Dr. Rice, a psychiatrist.

Chief Sweet testified that he arrived at the scene of the shooting shortly after Officer Mackney and heard defendant tell Mackney that the decedent had been physically abusing her for the past year and a half and that, on the evening before the shooting, he told her that he wanted her to commit suicide or he would kill her. Sweet stated that his department had never received any complaints from defendant regarding domestic violence but that, at approximately 11:30 P.M. on the night before the shooting, he had been informed by Richard Meyers that defendant was being physically abused by the decedent. Meyers told Sweet that defendant had told him earlier that same evening of the abuse she was receiving. Meyers then said that he had reported the situation to the decedent's father, the Olean police and a domestic violence hotline service in Salamanca. Sweet offered to visit the couple's trailer, but Meyers told him not to because he had promised the defendant that he would not tell anyone. Meyers told Sweet that everything was fine at the trailer when he left earlier at about 6:30 P.M. and that the decedent's father had mentioned that he was going to speak with his son about the matter.

Investigator Emerson testified that he interviewed defendant at the trailer shortly after the shooting. Defendant told him that she killed the decedent because she could not stand the abuse any longer and felt that it was the only thing she could do to end the violence. After making sure that arrangements had been made for the children, Emerson felt that it would be better to continue their conversa-

tion at the Wellsville State Police Barracks. After arriving there, defendant gave a five-page statement describing the couple's relationship, particularly during the days just prior to the shooting.

Defendant told Emerson that she and the decedent had been living together since 1978. She stated that from 1978 until July or August of 1981, her life with the decedent had been fairly normal. Shortly after the birth of their second child, however, the decedent began to frequently physically abuse her and accuse her of having sexual relations with other men. Beginning in September of 1981 the decedent became especially violent; this pattern of violence escalated dramatically after Christmas, 1982 and continued until the shooting.

Emerson further testified that defendant told him that Richard Meyers, on the afternoon prior to the shooting, had stopped in to see her and that she told Meyers of the abuse the decedent had recently been inflicting upon her. Meyers stayed at the trailer after the decedent arrived home from work at 3:30 P.M. and remained there until about 7:00 P.M., when he left to visit the decedent's father. Defendant and the decedent spent the remainder of the evening watching television without incident. At about midnight, Meyers returned to talk to the decedent about his abuse of defendant. From 12:30 A.M. to 3:00 A.M., the three sat and discussed the couple's problems. Thereafter, Meyers fell asleep in the living room and the couple proceeded to the bedroom, where decedent told defendant that "this is the last straw" and that she should kill herself. He then asked her how she intended to do so and she mentioned pills. He replied that pills were "not good enough". He repeatedly asked her if she had ever had sex with Meyers, which she denied. He then accused her of having sex with other men, grabbed her by the throat and choked her for a while. They argued further and eventually fell asleep.

At 4:20 A.M., an alarm clock went off and Meyers stuck his head into the bedroom. The defendant motioned to him trying to indicate that she wanted him to return to the living room without waking decedent. Meyers apparently misinterpreted the signal and left the residence. The defendant noticed his car lights from the bedroom window as

he left. Defendant then got out of bed to "walk about the house" and assess her situation. She feared that the decedent was going to abuse her even worse or possibly kill her when he awoke and decided that the only way out for her was to kill him.

Investigator Emerson was certain that the defendant had related no instances of physical abuse in the 24-hour period immediately preceding the shooting, other than the choking incident which occurred just before the couple fell asleep. Emerson testified that he did not believe that the choking incident was serious nor did he get the impression that the defendant considered it so. Emerson stated that he had asked defendant if she had ever sought official or familial help for her problems, but she indicated that she had not.

Donya Abrams testified that she was an employee of Cattaraugus Community Action, a nonprofit organization that sponsors various community programs. She was the director of the domestic violence program which, among other services, provided a 24-hour crisis "hotline".[1] Abrams stated that she had never had any contact with defendant. On the evening of February 24, one of the volunteers staffing the hotline told her that she was having difficulty handling a call from Richard Meyers. Abrams subsequently telephoned Meyers and had two conversations with him lasting a total of 2¼ hours. Meyers described the defendant as a friend who was the victim of abuse and asked for assistance. Abrams described the call as "odd" in that Meyers seemed to be in fear for the defendant's safety and yet he would not accept any of the options offered by Abrams. Abrams offered medical attention and help with police protection as well as help with removing the defendant from the home to a shelter. Meyers responded that, if defendant left, the decedent would find her and that he did not want any police contact because, if they visited the home, the decedent would kill defendant after they left. Abrams then testified as follows:

---

1. While the hotline is located in neighboring Cattaraugus County, there are no precise boundaries for the organization's services.

"Q. During any of those conversations, did he [Meyers] describe any violence that was threatened for that evening or the next day?

"A. He said that the only option that he could see that Leslie had was that she was going to have to kill her assailant, and it was the only possible way she could save herself. Shelter was not feasible, pressing charges was not feasible. Her only option was that she kill him.

"Q. He told you that?

"A. Yes, and he said that he wanted to know if she killed him in self defense, if she could come into the shelter after that. Obviously, no.

"Q. So you told him no?

"A. Yes.

"Q. Did this particular issue come up more than once?

"A. Over and over and over again with every option I gave, that was his pretty standard reply.

"Q. With every option you gave, he told you that Leslie would have to kill him?

"A. Yes."

Defendant repeatedly objected to Abrams' testimony as being inadmissible hearsay.

On cross-examination, Abrams stated that Meyers did not indicate that he had been requested to call the hotline by either the defendant or the decedent. Meyers had, in fact, stated that the situation at the trailer would become worse if it was learned that he told anyone. Abrams stated that on the evening of February 24, 1983, defendant called the hotline and spoke to a volunteer staff person for about one minute.

Richard Meyers testified that the decedent was his former brother-in-law[2] and that he had known him for some 10 years. Meyers usually visited the couple at the trailer once or twice a month. In January and February, 1983 he visited a total of four or five times.

Prior to 1983, Meyers became aware through a phone conversation with the defendant that the couple was experiencing domestic problems. On New Year's Eve, Meyers

---

2. Meyers had been divorced from the decedent's sister since the shooting.

learned that the decedent was going out and he decided to visit the defendant to give her a pamphlet on abused wives. The pamphlet contained the hotline number for Cattaraugus Community Action. When Meyers went to the trailer, defendant told him she could not let him in because the decedent had "glued the door shut" so he could determine whether someone had entered. She told Meyers to hide the pamphlet in some boxes on the porch and that she would get it later. She also asked Meyers to leave quickly.

Meyers testified that he went to the trailer the day before the shooting to check on defendant and the children. At that time he noticed a burn mark on her face and various bruises on her legs. Meyers offered defendant some money to enable her to move out of the trailer, but she declined because she feared the decedent would find her. Defendant asked Meyers if she could live with him until she could find an apartment and he told her that she could. Meyers offered to take the defendant away from the trailer in his vehicle numerous times that day, but she repeatedly declined. Meyers told her that, if she pressed charges, she could move into a shelter for at least 30 days, but she responded that she was frightened the decedent would find out. When the decedent returned home from work, he talked with Meyers and stated that he wished he could find a way to get rid of his wife. Meyers then persuaded the decedent to go into town with him for some groceries, hoping that in the interim defendant would call the hotline. After returning to the trailer and watching television, Meyers left to go to the Olean police.

Meyers stopped first at the decedent's father's house and explained the situation. He suggested to the father that on Monday they go to the trailer while the decedent was at work and "get her out of there". He then went to the police and eventually called the hotline. Later that evening Meyers went to the Cuba police to ask them if they would go to the trailer and occupy the decedent so that he could remove defendant. The police told him they would go to speak with the defendant the following day while the decedent was at work. Meyers called the hotline again and mentioned that he felt the defendant was suicidal. Contrary to Abrams' testimony, Meyers stated that he never indicated that he felt the decedent's life was in danger.

Meyers returned to the trailer later in the evening. He spoke privately in the bathroom with decedent and told him that he had seen the marks on defendant's face. Meyers also expressed his belief that defendant was suicidal and should get medical or psychological attention. The decedent stated that the couple was going to see a therapist in the future. The decedent then spoke privately with defendant in the bathroom. When they came out, defendant stated that she had told the decedent "everything". The decedent seemed confused and began to mumble. Meyers then announced that he was going to call a therapist but instead he called the hotline again. He put defendant on the phone and she talked for about 15 minutes. Meyers heard her setting up an appointment with a therapist. After the phone call, Meyers told defendant privately that he wanted to leave. She asked him to stay because she was afraid the decedent would kill her if he left. Meyers told the decedent that his mother's house, where he was living, would be locked at that time of the morning and asked if he could stay at the trailer. The decedent allowed him to stay in the living room. At about 2:00 A.M. the couple retired to their bedroom; Meyers fell asleep and awoke at about 4:00 to 4:30 A.M. He decided to leave because he was confused and depressed. He knocked on the couple's bedroom door to announce his departure as an alarm clock in the bedroom sounded. Defendant motioned to him to be quiet and he subsequently left.

On cross-examination, Meyers stated that defendant had told him that the decedent would often glue the door of the trailer shut when he would go out in order to tell if defendant left the trailer. He also testified that she had told him of being physically abused by the decedent with various instrumentalities. Meyers stated that the decedent never admitted abusing defendant.

The decedent's parents, Frances and Jack Allison, both testified that they had offered to remove defendant from the domestic situation at the trailer on numerous occasions in the months preceding the shooting. Additionally, Nanette Nowak, the decedent's sister, testified that defendant had at least two relatives living nearby in Olean.

For the defense, Dr. Taylor testified that he had conducted a physical examination of defendant following the shooting and had discovered multiple wounds covering her body which were in various stages of healing. She had abrasions over her left eye, on the right side of her face and on her neck. The abrasions on her neck were transverse and appeared both on the front and back of her neck and, according to Dr. Taylor, could have been caused by rope burns. Defendant had several puncture wounds, welts and bruises on her arms and torso, a contusion and an abrasion inside her vagina, and superficial burns, abrasions and contusions on her legs and feet. Dr. Taylor estimated that the injuries were anywhere from a few days to three weeks old and might have been the result of abuse or battering.

Defendant testified in detail concerning physical abuse she suffered from the time she moved in with decedent in 1978. Through Christmas of 1981 the severity of the abuse increased; on one occasion the decedent took her outside and beat her head against a tree and on another he stabbed her in the foot with a pencil, which resulted in a visit to the hospital to remove part of the pencil. Defendant indicated that the abuse was almost always related to the decedent's accusations that she was "sleeping around". She admitted that she had had sexual relations with another man in the fall of 1979 but insisted that she had otherwise been faithful to the decedent. Defendant testified that she eventually told the decedent of the incident because she was suffering from guilt.

In the fall of 1982 the abuse took on an even more sinister tone. The decedent discovered a bull whip in a utility building on the property and began using it to beat defendant while she was hog-tied. He told her that he was teaching her a lesson about lying as to her fidelity. Around Thanksgiving the decedent forced defendant to get a piece of wood from the woodpile and used it to beat her about the body, striking numerous blows to the head and, in addition, breaking one of her toes. Defendant testified that decedent also abused her with various devices, including ropes, belts, a wooden dildo, a lighter, a vacuum cleaner attachment, gloves, needle-nosed pliers and a hunting knife. On New Year's Day, 1983 defendant spoke to a third

party about the abuse for the first time, telling the decedent's mother that she had been whipped.

Defendant acknowledged that she continued to have sexual relations with the decedent despite the abuse because she felt that she was his slave; at times the decedent insisted that she call him master.

The week of the shooting, defendant stated that violence escalated to an even higher level. On Monday, February 21, 1983, the decedent roughed up defendant prior to leaving for work in the morning and verbally abused her upon his return in the afternoon. On Tuesday, the 22nd, the decedent told defendant he intended to prevent her from having sex with other men and proceeded to place an electric immersion coil into her vagina. When defendant removed the hot coil, the decedent took it from her and applied it to various parts of her body. That same day the decedent attempted to hang defendant in the shed. Defendant testified that the decedent struck her with a mallet when she tried to position herself to keep from choking. The decedent eventually hit defendant in the head, causing her to black out, and later forced her to put her hands on a table so that he could beat them with the mallet.

On the day before the shooting, the decedent punched defendant and beat her head against the cupboards because of the manner in which she had awakened him for work. Defendant stated that, when Meyers came to the trailer on the night before the shooting to talk with the decedent, she had wanted to prevent their discussion. When the decedent brought her into the bathroom after talking to Meyers, defendant testified that he told her: "You know, I had a talk with God, and God says I have to kill you, and he said that I have to kill the kids, too." The decedent also indicated that he was going to take his own life in order to escape punishment. All of this was going to occur after Meyers left. Defendant subsequently told Meyers privately that she wanted him to stay.

When decedent and defendant returned to the living room, the subject of abuse was discussed and the decedent told Meyers that defendant was a liar. When the couple retired to the bedroom, the decedent told the defendant that she had "really blown it" and that tomorrow she would

die. He gave her the choice of being killed or killing herself. He concluded that he would have to kill her, the children and himself after Meyers left. Defendant felt that he was serious because of his tone of voice and the look on his face. When Meyers later appeared at the bedroom door to announce his departure, defendant motioned for him to stay; she did not call out for fear of waking the decedent. Defendant stated that she could not drive and that decedent's truck outside the trailer was of no use to her. In any event, the truck keys were in decedent's pocket. As defendant contemplated her situation, she noticed the guns in the living room and decided that shooting decedent was her only way out. She then took a .22 caliber rifle and shot decedent in the head five times from short range while he was sleeping in the couple's bed.

Defendant stated that she never considered going to her parents about her suffering because they did not approve of her choice of living arrangements and running back to them would have been an admission of failure. She testified the decedent would use anything he could come up with as a basis for abusing her. He told her on numerous occasions that he would find her and kill her if she ever left him. Instead of seeking help, defendant stated that she tried to be the best wife and mother that she could be so as to make the decedent happy. Defendant testified that, while she told Meyers of some of the abuse she had been suffering, she swore him to secrecy about it. She never read the pamphlet on abuse he gave her for fear that the decedent would find out.

On cross-examination, defendant stated that while she saw a gynecologist during her pregnancies, she never mentioned the abuse she had been receiving. She did not seek help because she did not know where to go and because she hoped that decedent was merely going through a phase and the problem would resolve itself. Defendant acknowledged that she had been receiving public assistance but she never broached the subject of abuse with the social services authorities. Defendant also acknowledged that the decedent's mother had offered to help remove her from the situation at the trailer but that, by the time she realized that she should leave, the decedent had already begun to make his threats.

Defendant said that, while there were opportunities for her to have read the pamphlet on abuse in private, at such times she had forgotten about it. She acknowledged that on the day prior to the shooting, Meyers had told her that he could help remove her from the trailer and find a safe place for her to stay. She also stated that the written statement prepared by the police after the shooting did not contain all of the information which she had provided including decedent's reference to God's directives prior to the shooting. Defendant admitted that she did not mention this statement by the decedent during her Grand Jury testimony. The incident on the morning before the shooting, where the decedent had attacked the defendant upon awakening, had also not been mentioned in either the written statement or at the Grand Jury.

Dr. Matilda Rice, a certified psychoanalyst, testified concerning the battered wife syndrome. Dr. Rice described the battered wife syndrome as a multistage form of familial "disease". In stage one there is verbal abuse and possibly minor physical abuse. Stage two involves an escalation of physical abuse in degree and quantity and stage three occurs when the abuse "gets totally out of control". Having examined defendant only a few months after the shooting, Dr. Rice opined that defendant displayed the classic signs of the battered wife syndrome and that her situation was at "the worst end of stage three".

Dr. Rice stated that the abused wife undergoes a personality change as the abuse increases. She becomes frightened and unable to project her thinking into the future. She lives her life from one beating to the next and her thoughts relate solely to her efforts to avoid the next beating. The wife is usually hopeful that, if she pleases the husband, the abuse will stop. For his part, the husband usually expresses remorse after a beating and attempts to reconcile with gifts and/or promises to refrain from abuse in the future. The wife then sees the husband in a different light and is filled with false hope. Another aspect of the syndrome is that the wife eventually feels that she cannot escape her tormentor and that she will be tracked down if she attempts to flee the situation. Her self-esteem vanishes and her confidence is shattered. She feels that no one

would believe her if she told them about the abuse and, thus, she keeps it to herself.

Dr. Rice stated that a battered wife does not consider retaliation and, in her opinion, defendant was not planning to retaliate when she awoke on the fateful morning. She also opined that the decedent had given "signals" to the defendant, such as the hanging, that he was close to actually killing her. According to Dr. Rice, defendant was terrified on the morning of the shooting and she saw killing the decedent as a means of escape. Dr. Rice had "no doubt" that, when the defendant pulled the trigger, she was reasonably in fear for her life and the lives of her children. Dr. Rice opined that defendant was neither psychotic nor emotionally disturbed at the time of the shooting.

On cross-examination, she acknowledged that the battered wife syndrome had not been completely accepted in psychiatric circles. She said that a woman in stages one and two of the syndrome still generally has the capability of reaching out for help.

On rebuttal for the People, Investigator Emerson testified that defendant had never mentioned that the decedent had claimed to have spoken with God.

In his closing statement, defense counsel told the jury that the sole issue in this case was whether defendant justifiably had acted in self-defense. He went on to emphasize Dr. Rice's opinion that defendant was not emotionally disturbed at the time of the shooting. Defense counsel subsequently requested that the court delete any reference to extreme emotional disturbance in its charge to the jury. The stated basis of this request was defense counsel's concern that the jury would dwell on the concept of emotional distress and neglect to give defendant's justification defense the consideration it deserved. The court denied this request and made the following references to extreme emotional distress in its charge:

"THE COURT: As you will note, the law of this State is explicit in stating that the fact that homicide was committed under the influence of extreme emotional disturbance need not be proved in any prosecution for the crime of

manslaughter in the first degree. Therefore, in your deliberation, you need not consider whether or not the defendant acted under the influence of extreme emotional disturbance * * *

"Again, I want to caution you that because the charge of manslaughter in the first degree, under subdivision 2 of Section 125.20 of the Penal Law, presupposes the existence of extreme emotional disturbance, it is not necessary for the People or the Defense to prove the existence or non-existence of extreme emotional disturbance on the part of the defendant."

Defense counsel also specifically requested that the court delete any reference in its charge on justification to the concept of retreat. The prosecution conceded that defendant was under no legal obligation to retreat since the incident occurred in defendant's dwelling and even went so far as to request the court to distinguish between the availability of alternatives to defendant prior to the shooting and the concept of retreat. Despite both these requests, the court charged the jury on justification as follows: "THE COURT: If the defendant, Leslie A. Emick, was confronted by the appearance of danger on February 25, 1983, which aroused in her mind an honest and reasonable conviction and fear that she was about to suffer death or serious physical injury, she would be justified in using deadly physical force in her self-defense. Even so, a person is not justified in the use of deadly physical force if she knows that she can retreat without the use of such deadly physical force with complete safety to herself and other persons. However, she does not have to retreat if she is in her own dwelling, and she is not the initiator of the agression [sic]. If a person is not the initiator of the aggression, she is not required to leave her home to avoid the threat of physical danger even if the party making the threat is a member of the same household."

The jury thereafter returned from its deliberations three times to request clarification of the court's charge on justification. The jury's third request was for the court to clarify the concept of retreat and the requirement that defendant must have "exhaust[ed] all possible means of retreat". In each case the court merely reread the relevant

portion of its original charge. Approximately one-half hour after its third request, the jury returned a guilty verdict. Defendant was thereafter sentenced to an indeterminate term of imprisonment of 2 to 6 years.

Four issues are presented on this appeal: (1) whether the indictment made extreme emotional distress an element of the crime of manslaughter in the first degree; (2) whether the trial court erred in permitting testimony regarding the availability of alternatives to defendant prior to the shooting; (3) whether the court erred in allowing the introduction of Donya Abrams' testimony concerning her conversation with Richard Meyers the night before the shooting; and (4) whether the court's charge on extreme emotional disturbance, as set forth in subdivision 2 of section 125.20 of the Penal Law, and the concept of retreat was erroneous as a matter of law.

█ The first issue to be considered is whether the indictment made extreme emotional distress an element of the crime of manslaughter in the first degree. This issue stems from the last sentence of subdivision 2 of section 125.20 of the Penal Law, the section under which defendant was indicted, which provides: "The fact that homicide was committed under the influence of extreme emotional disturbance constitutes a mitigating circumstance reducing murder to manslaughter in the first degree and need not be proved in any prosecution initiated under this subdivision". Defendant's argument that this sentence makes extreme emotional disturbance an element of the crime charged is refuted by the statute's characterization of that concept as a "mitigating circumstance" which need not be proven. The rejection of extreme emotional disturbance as an element of first degree manslaughter is further supported by the staff notes of the Temporary Commission on Revision of the Penal Law and Criminal Code which provide, in relevant part, that the last sentence of subdivision 2 of section 125.20 of the Penal Law was intended to "assure that [extreme emotional disturbance] is neither an element of first degree manslaughter nor a defense thereto and need not be alleged by the People or proved by either party in a prosecution therefor" (Fourth Interim Report of NY Temporary Comm on Revision of Penal Law and Criminal Code, p 30).

The second issue presented is whether the court erred in permitting testimony regarding the availability of alternatives to a defendant prior to the shooting. Defendant argues that the following evidence was highly prejudicial in view of the fact that she was under no obligation to retreat and, thus, should not have been admitted at trial: decedent's parents' testimony that they had made numerous offers to remove defendant from the trailer in the months preceding the shooting; decedent's sister's testimony that defendant had two relatives living nearby in Olean at the time of the shooting; and Donya Abrams' testimony about the various avenues of relief available to defendant through the community domestic violence program.

■ Generally, "all relevant evidence is admissible * * * unless to admit the evidence would violate some exclusionary rule" (Richardson, Evidence [Prince, 10th ed], §§ 5, 146-147; see *Ando v Woodberry,* 8 NY2d 165; *People v Murray,* 90 AD2d 640; *People v Ahearn,* 88 AD2d 691). Here, the People correctly assert that the evidence in question is extremely relevant and probative as to defendant's state of mind at the time of the shooting. This evidence was critically important since it was up to the jury to determine, from a subjective standpoint, whether defendant reasonably believed that she was in imminent danger of having deadly physical force inflicted upon her and whether the nature and extent of the force used to meet that danger was reasonable under the circumstances. Since defendant's alleged fear of being immediately killed when the decedent awoke was premised, to a large extent, on the escalating pattern of abuse she had been subjected to over the preceding months, it was proper for the People to show how defendant apparently ignored offers of help during this time and, instead, elected to remain at the trailer with the decedent.[3] The evidence of alternatives was admissible since it was relevant to the reasonableness of defendant's perceptions and not to the question of whether defendant was obligated to retreat.

---

**3.** It would seem that the principal reason the defense put Dr. Rice on the stand to testify concerning the "battered wife syndrome" was to rebut the common perception that defendant could have left the decedent and their turbulent domestic setting. It would have been improper for the court to allow this testimony, explaining why defendant did not leave the decedent, and not allow the People the opportunity to show that she was given various alternatives to remaining alone with the decedent.

The third issue is whether the court erred in admitting Donya Abrams' testimony concerning her conversation with Richard Meyers the night before the shooting. Defendant argues that Abrams' testimony was inadmissible hearsay, and that its introduction was extremely prejudicial to her defense of justification.

█ The hearsay rule "forbids the use of an assertion made out of court as testimony to the truth of the fact asserted (Richardson, Evidence [10th ed — Prince], § 201; *People v Settles,* 46 NY2d 154, 166)" (*People v Edwards,* 47 NY2d 493, 496). The People argue that Abrams' testimony concerning her conversation with Meyers was not hearsay since it was not offered for its truthfulness, but, rather, to show the climate of the evening preceding the shooting. This argument is without merit. The People do not explain, nor can we conceive of, how the jury could have possibly been enlightened as to the climate of the evening by Meyers' statements without necessarily accepting them as true. At best, these statements were offered to show Meyers' state of mind on the night before the shooting. Even if this were the case, however, the statements were not properly admissible "to show the state of mind of the witness, since [Meyers'] state of mind was in no way relevant in this matter" (*People v Allen,* 74 AD2d 640, 642).

Given the fact that defendant's defense of justification was based upon her claim that she feared for her life on the morning of the shooting, principally because of the death threat issued only a few hours earlier by the decedent, permitting the jury to hear that Meyers believed that on the night before the shooting, prior to the decedent's alleged death threat, she would have to resort to killing the decedent was extremely prejudicial to defendant's case. While Meyers indicated only that it was his belief that defendant would have to resort to killing the decedent, his belief may well have been impermissibly imputed to defendant by the jury because of the frequent contact between Meyers and defendant on the day before and the morning of the shooting. Imputing this belief to defendant would have fatally undermined defendant's claim that she did not formulate the intent to kill the decedent until the morning of the shooting by injecting premeditation into the case.[4]

4. Worthy of note is the extremely prejudicial form of the first question put to Abrams concerning her conversation with Meyers: "During any of those conversations,

Since defendant's justification defense was not over-whelmingly disproved beyond a reasonable doubt, the court's error in allowing Abrams to testify concerning her conversation with Meyers requires reversal of defendant's conviction and the granting of a new trial (*People v Crimmins,* 36 NY2d 230).

While resolution of this appeal does not require reaching the final issue, whether the court's charge on extreme emotional disturbance and retreat was erroneous, since these questions may recur upon retrial, they merit discussion.

■ The first aspect of defendant's attack on the court's charge with respect to extreme emotional disturbance is that it impermissibly shifted the burden of proof on intent to defendant. While it is true that the court instructed the jury to presuppose the existence of extreme emotional disturbance, the jury was clearly instructed on the nature of the element of intent and that the People had the burden of establishing that element. Defendant's argument incorrectly equates extreme emotional disturbance with intent. As the Court of Appeals stated in *People v Patterson* (39 NY2d 288, 302, affd 432 US 197): "In New York, the prosecution is at all times required to prove, beyond a reasonable doubt, the facts bearing the defendant's intent. That the defendant acted because of an extreme emotional disturbance does not negate intent. The influence of an extreme emotional disturbance explains the defendant's intentional action, but does not make the action any less intentional."

Defendant also argues that the court's direction to the jury to presuppose the existence of extreme emotional disturbance confused the jury with respect to defendant's justification defense. The basis of this argument is the claim that, without clarifying instructions, there is a logical conflict between saying a person is emotionally disturbed and yet capable of thinking and acting reasonably.

did [Meyers] describe any violence that was threatened for that evening or the next day?" It is unclear whether the question was referring to violence threatened by the decedent or by defendant. Abrams' response, that Meyers said defendant was going to have to kill the decedent in order to save herself, could have been taken by the jury to mean the only imminent threat of violence known to Meyers came from defendant.

While the two concepts are not mutually exclusive, given that the reasonable belief standard set forth in the justification statute (Penal Law, § 35.15) refers to the subjective belief of the defendant (*People v Miller,* 39 NY2d 543, 548; *People v Wagman,* 99 AD2d 519, 520), the failure of the court to properly explain to the jury the concept of extreme emotional disturbance and emphasize that the statutory presumption should not influence and should not prevent consideration of defendant's justification defense was error.

Finally, since defendant was in her own dwelling and, pursuant to her theory of justification, was not the initial aggressor (Penal Law, § 35.15, subd 2), the court should not have mentioned retreat in its charge. The prosecution even agreed that it was improper for the court to charge retreat. The effect of this charge, particularly as evidenced by the jury's third request for clarification on the concept of retreat,[5] was to needlessly confuse the jury and divert it from the central question in this case, whether defendant reasonably believed she was about to suffer death or serious physical injury at the hands of the decedent on the morning of the shooting.

The judgment of conviction should be reversed and defendant granted a new trial.

HANCOCK, JR., J. P., CALLAHAN, DENMAN and BOOMER, JJ., concur.

Judgment unanimously reversed, on the law and facts, and a new trial granted.

---

5. That the jury was obviously confused and preoccupied with the concept of retreat is evident from the reference in their third request to that part of the court's charge dealing with "exhausting all possible means of retreat". This language was never used by the court.