OPINION OF THE COURT
Sara P. Schechter, J.
Respondent parents in the proceeding before the court are charged with sexually abusing their children — Josephine, born in 1985 and now six years of age, and Glenn, born in 1987 and now almost five years old. The definition of sex abuse in Family Court Act § 1012 (e) (iii) is cross-referenced to sections of the Penal Law. Specifically in the instant case, respondent father is charged with having improperly touched the genitals and rectums of both children, conduct which would constitute sexual abuse in the third degree, a violation of Penal Law § 130.55. Respondent mother is charged with having allowed the abuse, in that the acts occurred in her presence and she failed to protect the children. In addition, both respondents are charged with sexually abusing the children by having taken pornographic photographs of the children, a violation of Penal Law § 263.05, "Use of a child in a sexual performance.” In the alternative, it is alleged that the children are neglected in that the foregoing conduct constitutes improper supervision of the children by the respondents.
This case came to the attention of the authorities on April 12, 1991 when the respondent mother went to the 68th Police Precinct to seek assistance after an incident of domestic violence. There she was referred to a worker with the Victim Services Agency, Barbara Anselmo. Ms. Anselmo testified that upon arrival respondent mother was pale, shaking, crying and incoherent. After about an hour, respondent mother became calm enough to speak and, in the ensuing discussion, asked if it was normal for a father to grab his children in the groin area, dance naked with them and take photos of them naked. Ms. Anselmo said, "No.” After further discussion respondent mother was relocated to a battered women’s shelter. The *679 children were medically examined at Bellevue Hospital on April 19, 1991, following which a report of suspected child abuse or maltreatment (hereinafter 2221) was called in by the Bellevue social worker. The Child Welfare Administration (hereinafter CWA) was already involved, however, as a result of two 2221’s it had received on April 18, 1991, relaying allegations made by the father against the mother. Upon investigation those allegations proved to be unfounded.
The CWA caseworker, Edris Juandoo, interviewed the respondent mother and the children on April 22, 1991. Josephine told the caseworker that the father plays with her and touches her in the "tushie and in the front, in the hole.” Respondent mother recounted to the caseworker the same sort of touching she had described to Ms. Anselmo, and she told the caseworker that when she confronted the father about it, he threatened to kill her.
THE PHOTOGRAPHS
On April 24 Mr. G. met with the caseworker and showed her a batch of photographs of the children, which he alleged the mother had taken. The caseworker observed that in most of the photos the children were half or totally nude. On May 1, 1991 Ms. Juandoo met with the mother at the shelter and questioned her about the pictures. The mother then showed the caseworker a bundle of the same sort of pictures. Respondent mother told the caseworker that the respondent father had taken the pictures and that she had removed them from the apartment on April 25 and April 28 when she went back with a police officer to collect her belongings.
During the hearing each respondent produced a set of photographs which each identified as the pictures they showed to the caseworker. Although neither respondent admitted being present when the most questionable pictures were taken, each testified that the other parent was the only person who could have taken them. Neither respondent has offered any other explanation for the photos, which were taken inside the respondents’ apartment. One photograph produced by both respondent parents depicts Glenn, who appears to be between three and four years old, lying on his back on a couch, clad in a shirt and pants. In this photo the child’s underwear and jeans are pulled down to the knees, exposing him from waist to mid-thighs. He has an erection, which is conspicuous due to the angle of the photograph.
*680 The court finds that this duplicate photograph of Glenn lying on the couch constitutes a lewd exhibition of the genitals within the meaning of Penal Law § 263.00 (3), and thus violates Penal Law § 263.05. The pose, the camera angle, the studied arrangement of the clothing, and the age of the child in this photo combine to create unmistakable sexual innuendo. The fact that the child’s penis is erect brings the picture within a line of cases which have held such depictions of adult males obscene. (United States v Wild, 422 F2d 34 [2d Cir 1969]; People v Clark, 60 Misc 2d 1073 [Crim Ct, NY County 1969].)
The court further finds that respondent father took the lewd photograph. The child Josephine spontaneously told Dr. April Kuchuk, a psychologist who interviewed the child at Bellevue Hospital, that her father would take pictures of her and her brother with their clothes off, and specifically stated that the mother did not. Furthermore, the taking of this photo is consistent with the respondent father’s over-all approach to the children as sex objects, which will be discussed further below. Accordingly, the court finds the child Glenn to have been sexually abused by the respondent father by reason of the father’s having used him in a sexual performance in violation of Penal Law § 263.05.
THE SEXUAL CONTACT ALLEGATIONS
On April 19, 1991 Josephine was examined at Bellevue Hospital by Dr. Margaret McHugh, a pediatrician with particular expertise in child sexual abuse. Although Dr. McHugh found the child’s hymen intact, the fossa navicularis and the posterior fourchette were markedly thin and pale. In addition there was venous congestion around the rectum, indicative of damage to the network of blood vessels underneath the rectal area. Together these findings indicate that there has been trauma to the perianal area due to rubbing or manipulation.
Dr. McHugh testified that a child would not cause this trauma by masturbation, and neither would such thinning of the fourchette be consistent with an accident such as a fall onto a bicycle crossbar or against a bathtub faucet, as those events would cause tearing, rather than thinning, of the tissue. The rubbing could have been done by a hand or an instrument, but the gentle pressure required to apply medicine to a rash would not produce the effect seen here, nor would a child scratching herself to relieve an itch cause it. *681 Although this injury is different from that which would be caused by penetration into the vagina, the doctor testified that it is nonetheless consistent with sex abuse.
Prior to the physical examination, Josephine was also interviewed by a psychologist at Bellevue, Dr. April Kuchuk. The child’s affect, coupled with her age-inappropriate knowledge of the adult male penis led Dr. Kuchuk to conclude that her psychological findings as to Josephine were consistent with the child’s having been sexually abused.
The respondent mother, called as a witness by the petitioner, extensively described respondent father’s sexual abuse of both children. She testified that the father played violent games with the children naked or in underpants and that on numerous occasions while "playing” with the children, Mr. G. would grab them in the crotch. Sometimes while grabbing Josephine’s buttocks or groin area, he would say, "This is mine.” On one occasion the mother also observed the respondent father licking Josephine’s nipples. She also recalled instances when she came into the bedroom and discovered the respondent father manipulating Josephine’s vaginal area and a similar instance when he was stroking little Glenn’s penis. On these occasions respondent father was naked, and respondent mother observed that he had an erection.
On the basis of the respondent mother’s testimony and Josephine’s out-of-court statements, which were amply corroborated by the physical findings of Dr. McHugh and the psychological findings of Dr. Kuchuk, the court finds that the respondent father sexually abused both children by touching their intimate parts for the purpose of his sexual gratification.
THE RESPONDENT MOTHER’S CULPABILITY
Respondent mother is charged with sexual abuse, and, in the alternative, neglect, based on her failure to protect the children from the father’s conduct described above. She asserts as a defense that she was a battered woman during the period when the abuse was occurring and asks that the charges against herself be dismissed.[1] CWA and the Law Guardian argue that whether the mother was a battered woman is irrelevant, since they contend that the Family Court *682 Act child protective article is a strict liability statute. The respondent father disputes that the mother was battered. He seeks to portray her as the prime perpetrator of the child abuse, a conclusion the court rejected for the reasons already stated.
The analysis of respondent mother’s defense must commence with a preliminary review of the legal responsibility of the passive parent of a child who has been sexually abused. The passive parent is guilty of child abuse when she "allows” the abuse to be inflicted. (Family Ct Act § 1012 [e] [iii]; Matter of Carrie R., 156 AD2d 756 [3d Dept 1989].) Petitioner and the Law Guardian urge this court to adopt an objective standard for the conduct of the passive parent, by which the passive parent would be held to have "allowed” the abuse if she failed to act as a reasonable and prudent parent would have acted to protect the child. (See, Matter of Carrie R., supra.) This argument fails to distinguish between a finding of abuse and one of neglect, however, and in several of the cases cited by petitioner and the Law Guardian in support of their strict liability argument the passive parent was actually found to have neglected rather than abused the child. (Matter of Keith R., 123 Misc 2d 617 [Fam Ct, Richmond County 1984]; Matter of Faith A.A., 139 AD2d 22 [3d Dept 1988]; Matter of Scott G., 124 AD2d 928 [3d Dept 1986].)
In a recent case which addresses the distinction between abuse and neglect it was held that when the passive parent is merely careless or negligent or inattentive, and by her failure to exercise a minimum degree of care leaves the child unprotected from the abusive parent, her conduct constitutes child neglect. (Matter of Jose Y., 177 AD2d 580 [2d Dept 1991].) "Neglect,” as defined by Family Court Act § 1012 (f) (i) (B) encompasses conduct which is not deliberate. (Matter of King v Perales, 153 AD2d 694 [2d Dept 1989].) Indeed, the definition of neglect includes failure to provide minimally adequate care due to the parent’s mental illness or retardation, conditions for which the parent is entirely without fault. (Matter of Ayana E., 162 AD2d 330 [1st Dept 1990], lv denied 76 NY2d 708 [1990]; Matter of Anna X., 148 AD2d 890 [3d Dept 1989].)
The conduct of the passive parent of a sexually abused child may range across a wide spectrum. At one extreme is the parent who actually instigates the abuse or encourages the abuser; at the other extreme is the parent who has failed to notice nonspecific symptoms in the child such as frequent rashes or recurrent urinary tract infections. In between lie *683 countless scenarios — a child who tries to confide in the passive parent and is rebuffed, a child who does confide and is disbelieved — through endless permutations of secrecy and deception. To label such varigated behavior as monolithic "abuse” would be arbitrary and insensitive and, in many instances, would needlessly stigmatize the passive parent without providing any greater protective or dispositional alternatives than would be available upon a finding of neglect. Instead, in determining where on the abuse-neglect spectrum the liability of a particular respondent lies, the court should use two coordinates: the passive parent’s knowledge or awareness of the actions of the abusive parent, and second, the passive parent’s actual ability to intervene to protect the child.
The first is not in dispute in the instant case, as respondent mother testified that she had witnessed numerous instances of improper touching of both children by the father over a period of years.[2] The issue of her ability to protect the children, however, is heavily contested. Unlike the issue of a passive parent’s degree of knowledge, which has been extensively litigated, the question of the parent’s ability to protect has received little judicial attention. In the case at bar, respondent mother does not claim that she was afflicted with a mental illness or a physical disability which rendered her unable to protect the children. Rather, she asserts that she was unable to take appropriate action because she was suffering from "Battered Woman’s Syndrome.”
Respondent mother established by convincing evidence that during her relationship with respondent father she was a battered woman. She testified to an escalating pattern of abuse, which began soon after the couple began living together. In the early days the abuse consisted primarily of constant verbal abuse, as an example of which Mrs. G. recalled a wedding of a family member when Mr. G. announced that any man there could have her for $10. Even more upsetting than the insults and invective where what Mrs. G. called "mind games,” in which Mr. G. convinced Mrs. G. that he spied on her at work and actually supplied details of what she had done during the day to prove that he was having her watched. He also treated her as his personal slave, and would frequently wake her late at night, even during her pregnancy, *684 to demand that she dress and go out to buy something he wanted to eat. Once, he cut her hair while she slept.
After the birth of the first child, Mr. G. became more menacing. Although he sent Mrs. G. out to shop and do laundry, he would never permit her to take the baby because he believed that the child would be kidnapped. He lacked patience to care for the baby himself, however, so that when Mrs. G. returned from some errand, he would scream at her for having been gone too long. The first instance of actual physical abuse occurred when Mrs. G. returned from such an errand and found Mr. G. inappropriately touching Josephine. When she grabbed the baby away and began to yell at the father, he hit her in the mouth, causing her lip to bleed. At that point Mrs. G. realized that she should get away, and within a few weeks, in May 1987, she took Josephine and went to the home of her sister in Florida.
While in Florida she gave birth to the second child, Glenn. Mr. G., who had located the mother by phoning around to hospitals in the area but told the mother he had hired a detective to find her, arrived at the mother’s bedside the day after Glenn’s birth. He was tearful and apologetic, said he knew the problems were his fault and that he was getting counseling. After the mother returned to her sister’s house, he kept up such a campaign of telephonic harassment that the mother finally felt she was imposing on her sister. Mr. G. sent a ticket, and Mrs. G. and the children returned to New York around the end of June 1987.
Following the return to New York, the domestic situation worsened. Mrs. G. learned that Mr. G. was not in therapy and neither did he plan to be. The physical abuse became more frequent and more intense. Mrs. G. described Mr. G. as being "like a time bomb.” Mr. G. would throw objects at Mrs. G., would punch and kick her, would bang her head against the wall. He threatened to do worse, and bragged about his strength and his mastery of martial arts, boasts which he reiterated during his testimony at trial.
In November of 1990 Mrs. G. sought medical treatment in the emergency room of St. Vincent’s Medical Center of Richmond for headaches, blurred vision and black lines in her left eye sustained as a result of an assault by Mr. G. Although St. Vincent’s responded appropriately by giving Mrs. G. a referral to the Victim Services Agency, she signed herself out against medical advice and failed to follow through on the referral.
*685 Respondent mother’s efforts to protect herself and the children after her return from Florida were meager. She began to call 911 once, but did not give the operator her address. She confided in her mother-in-law, who said she should just endure her situation and that Mr. G.’s father had been the same way. She stayed for days at a time at her mother-in-law’s home with the children. She mentioned Josephine’s frequent vaginal rashes to the pediatrician, but did not tell him of any sex abuse. She attempted to intervene when Mr. G. was behaving inappropriately with the children, but he told her, "Butt out, that’s how you get hurt so much.”
Respondent mother’s testimony concerning Mr. G.’s abuse of her was totally credible, while Mr. G.’s denials were unworthy of belief. Mr. G.’s conduct during the course of the pending proceeding also supports Mrs. G.’s testimony. The original attorney for respondent mother, the original Law Guardian, two former attorneys for respondent father and the Judge to whom this matter was originally assigned all withdrew from the case after conduct by Mr. G. which they perceived as threatening. After making an apology before the present Judge, Mr. G. made what appeared to be a sincere effort at self-control, but he nevertheless had to be admonished on several occasions during the trial for speaking out, laughing inappropriately, coming into the courtroom with his shirt unbuttoned to the waist and applauding sardonically as respondent mother’s expert on battered women left the courtroom.
Respondent mother produced two expert witnesses who testified about the condition known as "Battered Woman’s Syndrome”.[3] Ms. Anselmo, qualified as an expert by virtue of her experience, described the syndrome as "a breaking down of a woman’s self confidence and self respect to a point where she no longer knows if she is crazy or not.” She stated typically the cycle begins with psychological abuse, as it did with the Gs., builds to extreme tension followed by a violent episode and then a "honeymoon period,” in which the batterer apologizes, promises to do better and begs the woman not to leave. Mr. G.’s behavior when he found Mrs. G. in Florida is typical of the contrite phase. Over time the honeymoons get shorter and the violent periods expand. The battered woman experiences a sense of isolation, and often actually is socially isolated and confined to the home, which was true in Mrs. G.’s *686 case. As the syndrome progresses, the woman loses confidence in her judgment, as Mrs. G. did, and starts to believe that she must be the one who is crazy. Based on her observations of Mrs. G. in the police station and in the days immediately following, Ms. Anselmo testified that in her opinion Mrs. G. had been a battered woman for a long period of time.
The second expert on the subject was Valerie Bryant, a certified social worker and doctoral candidate at New York University who has for six years run a therapy group for battered women. Ms. Bryant was qualified as an expert by virtue of both her education and experience. Ms. Bryant testified that Mrs. G. is definitely a battered woman, who experienced much abuse on many levels — verbal, physical and sexual. Although Ms. Bryant had no contact with her when she was in the relationship, Ms. Bryant stated that when the respondent mother was being interviewed she spoke of the abuse as if she were reliving it, which indicated that the abuse she experienced was intense.
Ms. Bryant described the cycle of domestic violence as Ms. Anselmo had done, and stated her opinion that the role of the mother-in-law in urging Mrs. G. to "bear with it” was very instrumental in undermining respondent mother’s sense of self-worth and in reinforcing her sense of helplessness, particularly because she was estranged from her own family. Mrs. G., therefore, came to see herself as having few options. She lost the ability to protect herself, and thus lost the ability to protect the children as well. Ms. Bryant also noted that Mrs. G.’s dilemma is not uncommon, as a correlation between spousal abuse and child abuse is generally recognized among professionals who work with battered women and that in her opinion the two forms of abuse share very similar psychodynamics.[4]
Several State and Federal courts have admitted evidence concerning Battered Woman’s Syndrome.[5] Most often such *687 evidence has been offered in support of some form of self-defense claim by a woman who assaulted or killed the man who had been battering her. Occasionally it has been used to establish a lack of criminal intent (mens rea) or to assist the jury in assessing the credibility of the battered woman’s testimony, as when, for example, she may have recanted her charges against the abusive man. Although accounts have appeared from time to time in the news media of a "Battered Woman’s Syndrome defense” being offered in cases where a mother has been criminally charged for having failed to protect her children from an abusive father or live-in lover, these cases do not appear to have resulted in reported judicial decisions.* ****[6]
Although no New York decisions have been reported in which respondent asserted the Battered Woman’s Syndrome defense in the context of a child protective case, there are a few such decisions from other States. The Supreme Court of Appeals of West Virginia ruled in Interest of Betty J. W. (179 W Va 605, 371 SE2d 326 [1988]) that it was error to terminate the parental rights of a mother who had failed to protect her children from physical and sexual abuse by their father. The court held that the child protective agency should have provided services to help the mother attempt to overcome the effects of "classic spouse abuse,” particularly her tendency to place the children at renewed risk by reconciling with the abusive spouse.[7]
*688 This court is in accord with those who have recognized that Battered Woman’s Syndrome is a condition which seriously impairs the will and the judgment of the victim. The abused should not be branded as abuser. Respondent mother in the case at bar clearly did not condone the sexual abuse of the children by the respondent father, but rather, due to her affliction with Battered Woman’s Syndrome, was powerless to stop it. She cannot be said to have "allowed” the abuse within the meaning of Family Court Act § 1012 (e) (iii). Accordingly, the child abuse charges against the respondent mother herein are dismissed. The neglect statute, however, imposes strict liability. As respondent mother’s actions were manifestly inadequate to protect the children from the father’s ongoing abuse, of which she was well aware, a finding of neglect must be entered against her.
[Portions of opinion omitted for purposes of publication.]

. Respondent mother moved for an adjournment in contemplation of dismissal pursuant to Family Court Act § 1039. As the prerequisite consents of the petitioner and the Law Guardian were not given, that outcome is not under consideration.

. It is not entirely clear when respondent mother first became aware of the lewd photographs of Glenn, but' the court is convinced that it was very near the time of the final separation, in April 1991.

. A Frye hearing was not requested.

. See, Erickson, Battered Mothers of Battered Children, 1A Current Perspectives in Psychological, Legal and Ethical Issues, at 212, n 10 (1991).

. People v Emick, 103 AD2d 643 (4th Dept 1984); People v Torres, 128 Misc 2d 129 (Sup Ct, Bronx County 1985); People v Ciervo, 123 AD2d 393 (2d Dept 1986); Arcoren v United States, 929 F2d 1235 (8th Cir 1991); People v Aris, 215 Cal App 3d 1178, 264 Cal Rptr 167 (1989); Ibn-Tamas v United States, 407 A2d 626 (DC 1979); cf., Ibn-Tamas v United States, 455 A2d 893 (DC 1983); Hawthorne v State, 408 So 2d 801 (Fla Dist Ct App 1982); Terry v State, 467 So 2d 761 (Fla Dist Ct App 1985); Chapman v State, 258 Ga 214, 367 SE2d 541 (1988); Smith v State, 247 Ga 612, 277 SE2d 678 (1981); People *687 v Minnis, 118 Ill App 3d 345, 455 NE2d 209 (1983); State v Hodges, 239 Kan 63, 716 P2d 563 (1986), overruled on other grounds State v Stewart, 243 Kan 639, 763 P2d 572 (1988); State v Hundley, 236 Kan 461, 693 P2d 475 (1985); Commonwealth v Rose, 725 SW2d 588 (Ky 1987), overruled in part Commonwealth v Craig, 783 SW2d 387 (1990); State v Anaya, 438 A2d 892 (Me 1981); State v Hennum, 441 NW2d 793 (Minn 1989); State v Williams, 787 SW2d 308 (Mo 1990); State v Clay, 779 SW2d 673 (Mo App 1989) (recognizing expert testimony admissible under statute); State v Kelly, 97 NJ 178, 478 A2d 364 (1984); State v Gallegos, 104 NM 247, 719 P2d 1268 (1986); State v Leidholm, 334 NW2d 811 (ND 1983); State v Moore, 72 Ore App 454, 695 P2d 985 (1985); Commonwealth v Stonehouse, 521 Pa 41, 555 A2d 772 (1989); State v Hill, 287 SC 398, 339 SE2d 121 (1986); State v Furlough, 797 SW2d 631 (Tenn Crim App 1990); Fielder v State, 756 SW2d 309 (Tex 1988); State v Ciskie, 110 Wash 2d 263, 751 P2d 1165 (1988); State v Allery, 101 Wash 2d 591, 682 P2d 312 (1984); State v Steele, 178 W Va 330, 359 SE2d 558 (1987).

. See, for example, Hurtado, Child Abuse Case Tests New Defense: Lawyer to argue mom’s inaction caused by being battered herself, Newsday, May 15,1989 at 5, col 1 (city ed).

. See also, Shapley v Texas Dept. of Human Resources, 581 SW2d 250 (Tex Civ App 1979).