Argued and submitted October 24, 1983, affirmed March 6, reconsideration denied
April 19, petition for review denied May 7, 1985 (299 Or 154)

# STATE OF OREGON,
*Respondent,*

*v.*

# MELODY EATON MOORE,
*Appellant.*

(82-1390; CA A27021)

695 P2d 985

Ernest E. Estes, Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Stephen F. Peifer, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and James E. Mountain, Jr., Solicitor General, Salem.

Before Richardson, Presiding Judge, and Van Hoomissen and Newman, Judges.

RICHARDSON, P. J.

Van Hoomissen, J., concurring.

Newman, J., concurring.

## RICHARDSON, P. J.

Defendant was indicted for attempted murder and assault in the first degree for shooting her husband. She was convicted by a jury of assault in the second degree and sentenced to seven years imprisonment with a minimum term of five years pursuant to ORS 161.610. On appeal, she contends that the court erred in (1) striking the testimony of a defense witness, (2) excluding the testimony of a defense witness on the ground that the witness was not an expert and (3) limiting cross-examination of the victim. She also contends that the minimum sentence was unlawful.

The shooting occurred on July 19, 1982. That day defendant had purchased a pistol that she had previously put on layaway. She shot her husband while he was in the living room of their home. She does not contest the fact that she shot him but contends she did so in self-defense. The couple had been married for two and one-half years but had cohabited approximately one and one-half years before their marriage. In essence, defendant contends that, due to long-standing physical, sexual and psychological abuse by her husband, she was afraid he would harm her and shot in self-defense. That theory of self-defense has recently become known as the battered spouse syndrome. *See* Comment, 26 Vill L Rev 105 (1980-81); Gisenberg and Seymour, "The Self-Defense Plea and Battered Women," 14 Trial 34-42 (1978).

The accounts of the shooting from the victim and the defendant vary. The victim testified that he and defendant had had arguments over the two or three days before the shooting. He was lying on the davenport when defendant came into the house, pointed the gun and shot him in the shoulder. She fired two other shots which missed, and he ran into the bathroom. She then shot through the bathroom door and hit him in the other shoulder. The victim ran out of the house to a next door neighbor for help. Defendant followed and fired two more shots at him and the neighbor.

Defendant testified that she had placed the gun on layaway in a sporting goods store, because there had been a rape and an assault in the neighborhood and she needed some protection. On the day of the shooting, she testified, she picked up the gun with the intent of committing suicide, because she could no longer stand the abusive treatment she

was receiving from her husband. She changed her mind about suicide and decided to obtain her belongings and leave. She took the gun with her to protect herself from her husband while she was packing. When she entered the house, the victim was lying on the davenport. He got up and moved toward her with his hand inside his coat. She was afraid that he had a knife and would harm her, so she shot at him. She knew he usually kept a knife in the bathroom and, when he ran into the bathroom, she fired into the door to scare him. She then ran out of the house. When the victim followed her out, she fired two shots into the air to keep him at bay.

In a tape-recorded statement given to the police, which was played for the jury, and in her testimony, defendant detailed many incidents of sexual, physical and psychological abuse allegedly committed by her husband over the term of their relationship. She testified that he was an illicit drug dealer, used unlawful drugs and had on many occasions injected her with drugs against her will. He had threatened to sell her into prostitution in Mexico or compel her to make pornographic movies. She testified also that he had theatened to kill her if she left and had beaten her on many occasions. Defense witnesses testified to some threats and abuse that they had observed.

The first assignment of error concerns testimony the court struck after a witness began testifying. The witness had been a counselor at a local women's crisis center. She testified that the center had received approximately 100 calls from defendant between October, 1981, and December, 1981. She was prepared to testify concerning the substance of those contacts as reflected in the log book of the center. The court sustained the state's objection on the ground that the testimony concerned incidents that were too remote to be material to issues in the trial.

Defendant argues that the evidence is relevant to show her state of mind at the time of the shooting, which, she argues, was directly affected by the abusive behavior of the victim. She also contends that evidence of numerous reports to the crisis center would tend to corroborate her testimony of past abuses.

Defendant appears to present the issue as one of relevance to her basic defense and argues that the evidence is

probative of the battered spouse syndrome construct. The trial court allowed defendant considerable leeway in presenting evidence of alleged abuse by her husband. The court, on a number of occasions, expressed concern that the proceeding was degenerating into a trial of the defendant's and the victim's relationship. The court did not reject defendant's defense based on the battered spouse syndrome but ruled that the evidence offered through the counselor's testimony was too remote in relationship to the shooting to be probative of the defense. Evidence having some relevance may nevertheless be rejected if its probative value is outweighed by other considerations including undue prejudice, introduction of collateral issues, consumption of undue time or a tendency to confuse or lead the jury into collateral issues. OEC 403; *Carter v. Moberly,* 263 Or 193, 200, 501 P2d 1276 (1972).

■ ■  A trial court is given discretion in analyzing and balancing the various considerations necessary to an evidentiary ruling. In this case the evidence would apparently have been that the last contact defendant had with the crisis center was approximately seven months before the shooting. The testimony would simply have disclosed the number of complaints that defendant had made to the crisis center personnel. It would have been cumulative of defendant's description of past abuses and certainly would have prolonged the trial. We conclude that the court did not abuse its discretion in rejecting the testimony.

■  Defendant next claims that the trial court erred in excluding the testimony of defendant's proffered expert, who was called to testify concerning the battered spouse syndrome. In an offer of proof she described her qualifications and then discussed in detail the various aspects of the syndrome and related it to defendant and the facts of the case. She testified that, in her opinion, defendant was in a certain stage of the syndrome and was acting in self-defense. As disclosed in the offer of proof, the battered spouse syndrome is a descriptive phrase denoting a rather complex psychological phenomenon. The writings on the subject, as testified to in the offer of proof, are a result of extensive studies of spousal abuse cases. The studies conclude that spousal abuse follows a certain form and that there are predictable behavior patterns, often leading to defensive responses by the abused victim, including attempts

to harm or kill the abusive spouse. Authorities on the syndrome conclude that the victim's response should be considered a defensive action to a predictable resumption of the abuse, even if there is no overt conduct from the abusive spouse at the time the victim takes action.

The particular aspects of this complex defense require that the expert be qualified to evaluate the literature and the various phases of the syndrome and to apply the syndrome to the particular facts of the case before an opinion can be rendered whether the defendant was responding in self-defense. The witness here had been employed as a crisis center counselor and as a private counselor to abused women. She had taken college courses and was in the process of obtaining a Bachelor's degree and a Master's degree concurrently. She had no degrees. The trial court ruled that she did not have the requisite qualifications to testify as an expert witness or to give an opinion on the self-defense issue. We are not faced here with the availability of the defense, but *only* with the qualifications of the witness as an expert.

Whether a witness is qualified to testify as an expert is initially a matter for the court. In assessing the qualifications in relation to the subject of the proffered testimony, the court has a measure of discretion. *State v. Middleton,* 294 Or 427, 657 P2d 1215 (1983). The trial court acted within the range of its discretion in its determination of the witness' qualifications and rejection of the testimony.

■ In the third assignment, defendant contends that the court unfairly limited cross-examination of the victim. Defendant sought to cross-examine the victim by inquiring into specific acts of alleged abuse of the defendant by him during their four-year relationship. The court ruled that the questions were beyond the scope of direct examination and would unduly lengthen the trial. In addition, the court expressed concern that the questions propounded to the victim would raise collateral matters not appropriate for impeachment and would result in a trial of the couples' marital history. The offer of proof demonstrates that the questions defendant wished to ask were not appropriate cross-examination.

■ In a supplemental brief, defendant contends that the minimum sentence imposed pursuant to ORS 161.610 violates Article I, section 16, of the Oregon Constitution, the Eighth

Amendment to the United States Constitution and ORS 161.025(1)(f). We rejected an identical contention in *State v. Prock,* 68 Or App 391, 681 P2d 1186 (1984).

Affirmed.

**VAN HOOMISSEN, J.,** concurring.

We all agree that the trial court committed no error. The issues discussed in Judge Newman's concurring opinion should, therefore, be left for resolution in a future case where they have been properly raised in a trial court and assigned as error on appeal. Additionally, I do not share Judge Newman's understanding that the majority opinion implicitly addresses any of those issues. *See State v. Charles,* 293 Or 273, 647 P2d 897 (1982).

**NEWMAN, J.,** concurring.

Expert testimony describing the battered spouse syndrome could have assisted the jury to determine if defendant acted in self-defense under a reasonable belief that her husband was about to use unlawful deadly physical force against her. *See* OEC 702; ORS 161.219. It could have provided the jury with a framework within which to understand the evidence and determine the facts.

The trial court, however, properly rejected testimony of defendant's witness describing the "battered spouse syndrome," because that witness did not qualify as an expert. The trial court, therefore, did not clearly decide if expert testimony regarding the battered spouse syndrome is admissible as relevant to a self-defense claim. I understand the majority opinion to mean that testimony of a qualified expert witness on the battered wife syndrome may indeed be relevant to a claim of self-defense. I agree.

The majority describes the battered spouse syndrome:

"[T]he battered spouse syndrome is a descriptive phrase denoting a rather complex psychological phenomenon. The writings on the subject, as testified to in the offer of proof, are a result of extensive studies of spousal abuse cases. The studies conclude that spousal abuse follows certain form and that there are predictable behavior patterns, often leading to defensive responses by the abused victim, including attempts

to harm or kill the abusive spouse. Authorities on the syndrome conclude that the victim's response should be considered a defensive action to a predictable resumption of the abuse, even if there is no overt conduct from the abusive spouse at the time the victim takes action." 72 Or App at 458-59.

*State v. Kelly,* 97 NJ 178, 478 A2d 364 (1984), extensively discussed the syndrome and the professional literature concerning it. The court held that

"based on the limited record before us (the State not having had a full opportunity to prove the contrary), * * * the battered-woman's syndrome is an appropriate subject for expert testimony; that the experts' conclusions, despite the relative newness of the field, are sufficiently reliable under New Jersey's standards for scientific testimony; and that defendant's expert was sufficiently qualified. Accordingly, we reverse and remand for a new trial. If on retrial after a full examination of these issues the evidence continues to support these conclusions, the expert's testimony on the battered-woman's syndrome shall be admitted as relevant to the honesty and reasonableness of defendant's belief that deadly force was necessary to protect her against death or serious bodily harm." 97 NJ at 187.

Chief Justice Wilentz, writing for the court, described the attributes of the syndrome:

"As the problem of battered women has begun to receive more attention, sociologists and psychologists have begun to focus on the effects a sustained pattern of physical and psychological abuse can have on a woman. The effects of such abuse are what some scientific observers have termed 'the battered-woman's syndrome,' a series of common characteristics that appear in women who are abused physically and psychologically over an extended period of time by the dominant male figure in their lives. Dr. Lenore Walker, a prominent writer on the battered-woman's syndrome, defines the battered woman as one who is repeatedly subjected to any forceful physical or psychological behavior by a man in order to coerce her to do something he wants her to do without concern for her rights. Battered women include wives or women in any form of intimate relationship with men. Furthermore, in order to be classified as a battered woman, the couple must go through the battering cycle at least twice. Any woman may find herself in an abusive relationship with a man

once. If it occurs a second time, and she remains in the situation, she is defined as a battered woman.

"According to Dr. Walker, relationships characterized by physical abuse tend to develop battering cycles. Violent behavior directed at the woman occurs in three distinct and repetitive stages that vary both in duration and intensity, depending on the individuals involved." 97 NJ at 192.

The court described the three phases of the battering cycle: (1) tension building, (2) acute battering and (3) extreme contrition and loving behavior on the part of the battering male. It commented that the cyclical nature of battering behavior helps explain why more women do not leave their abusers. Some women perceive the battering cycle as normal; others become demoralized, because they cannot predict or control the violence, and sink into a state of psychological paralysis; others lack independent financial resources to extricate themselves and often feel isolated from people who might help; and some fear reprisal from their mates if they try to leave.

"The combination of all these symptoms—resulting from sustained psychological and physical trauma compounded by aggravating social and economic factors—constitutes the battered-woman's syndrome. Only by understanding these unique pressures that force battered women to remain with their mates, despite their long-standing and reasonable fear of severe bodily harm and the isolation that being a battered woman creates, can a battered woman's state of mind be accurately and fairly understood." 97 NJ at 196.

The court then stated that expert testimony on the battered-woman's syndrome is relevant to whether the defendant reasonably believed that deadly force was necessary to prevent death or serious bodily harm. In *Kelly*, the defendant claimed that she stabbed her husband in self-defense, believing that he was about to kill her. The expert's testimony, if accepted by the jury, would have helped it to determine whether, under the circumstances, a *reasonable* person would have believed that there was imminent danger to her life:

"The crucial issue of fact on which this expert's testimony would bear is why, given such allegedly severe and constant beatings, combined with threats to kill, defendant had not long ago left decedent. Whether raised by the prosecutor as a factual issue or not, our own common knowledge tells us that

most of us, including the ordinary juror, would ask himself or herself just such a question. And our knowledge is bolstered by the experts' knowledge, for the experts point out that one of the common myths, apparently believed by most people, is that battered wives are free to leave. To some, this misconception is followed by the observation that the battered wife is masochistic, proven by her refusal to leave despite the severe beatings; to others, however, the fact that the battered wife stays on unquestionably suggests that the 'beatings' could not have been too bad for if they had been, she certainly would have left. The expert could clear up these myths, by explaining that one of the common characteristics of a battered wife is her *inability* to leave despite such constant beatings; her 'learned helplessness'; her lack of anywhere to go; her feeling that if she tried to leave, she would be subjected to even more merciless treatment; her belief in the omnipotence of her battering husband; and sometimes her hope that her husband will change his ways.

"\* \* \* \* \*

"What the expert could state was that defendant had the battered-woman's syndrome, and could explain that syndrome in detail, relating its characteristics to defendant, but only to enable the jury better to determine the honesty and reasonableness of defendant's belief. Depending on its content, the expert's testimony might also enable the jury to find that the battered wife, because of the prior beatings, numerous beatings, as often as once a week, for seven years, from the day they were married to the day he died, is particularly able to predict accurately the likely extent of violence in any attack on her. That conclusion could significantly affect the jury's evaluation of the reasonableness of defendant's fear for her life." 97 NJ at 205.

Numerous psychiatrists, psychologists and social workers now consider the battered spouse syndrome an accepted basis for identification, counseling and treatment. I suggest that there is now authoritative literature and persuasive judicial opinion to support the conclusion that the battered spouse syndrome has general acceptance in the field. *See also State v. Kelly, supra,* 97 NJ at 220 (Handler, J., concurring and dissenting). If a witness qualifies as an expert and a sufficient foundation is laid, evidence of the battered spouse syndrome should be admissible. *See* OEC 401 and 702; *State v. Brown,* 297 Or 404, 417, 687 P2d 751 (1984).

If expert testimony on the battered spouse syndrome

had been admitted here, then the testimony of defendant's counselor regarding events seven months before defendant shot the victim would not have been too remote. It would have tended to show a history and pattern of abuse that supports the existence of the syndrome. Defendant could also have examined her husband about those other events, if she had called him as a witness in her defense.[1] Here, however, regardless of the order of proof, defendant failed to offer competent evidence describing the battered spouse syndrome that would have supported the admissiblity of evidence of those events.

---

[1] Defendant's cross-examination of her husband went beyond the scope of the state's direct examination and was properly limited.