COMMONWEALTH of
Kentucky, Movant,

v.

Mary Jane Keffer ROSE, Respondent.

Mary Jane Keffer ROSE,
Cross/Movant,

v.

COMMONWEALTH of Kentucky,
Cross/Respondent.

Supreme Court of Kentucky.

Jan. 22, 1987.

Rehearing Denied April 2, 1987.

David L. Armstrong, Atty. Gen., Joseph R. Johnson, Asst. Atty. Gen., Frankfort, Ian Sonego, Asst. Atty. Gen., Pikeville, for movant, cross/respondent.

Armand I. Judah, Frockt & Klingman, Louisville, for respondent, cross/movant.

LEIBSON, Justice.

Respondent, Mary Jane Keffer Rose, was convicted in Pike Circuit Court of Manslaughter II, "wantonly caus[ing] the death

of another person," and sentenced to five years. At trial her defense was that she had killed in self-protection, bolstered by evidence that she was a battered wife suffering from a so-called "Battered Wife Syndrome."

The shooting occurred in a house trailer occupied by the respondent, her husband, and two young children. The shooting terminated a stormy seven year marriage during which the wife had been beaten, threatened with death, and otherwise abused on numerous occasions. The respondent testified that on this particular occasion, shortly before the shooting occurred, her husband had kicked her and threatened to kill her. She then went into the trailer's bathroom where she retrieved a loaded gun, came out and fired at her husband who was standing in or near the kitchen. Her husband was unarmed at the time, and from the evidence taken as a whole the jury could have reasonably concluded that the respondent was not in imminent danger of death or serious physical injury that made it necessary to kill her husband at that particular moment.

The evidence of the respondent's mental state at the time of the shooting is, to say the least, confused. Although she shot him right between the eyes, she testified in her defense that she didn't intend to shoot him, that "I didn't plan it or anything, it just happened," and that she does "not really" remember shooting the victim. At one point she stated that "all that was going through my mind was all the things he had done to me in the past and him threatening us," and the vision of him stabbing her "all over my chest," which was imaginary because at the time he had no knife and was not stabbing at her.

In this state of facts the trial court instructed the jury on murder, intentional or wanton, first-degree manslaughter, second-degree manslaughter, and self-defense with the qualification that the respondent had "the right to use deadly physical force in so doing only if she believed it to be necessary in order to protect herself or her children from death or serious physical injury ... and subject to this qualification:

Regardless of what the defendant then believed, if you believe from the evidence beyond a reasonable doubt the following:

(a) that it was not in fact necessary for her to use any physical force against [her husband] in order to protect herself and her children or, if it was, she used more than was actually necessary; and

(b) that her belief to the contrary and the actions she took against [her husband] in reliance upon that belief amounted to wanton conduct, then she was not so privileged, and you will find her guilty of second-degree manslaughter...."

Defense counsel objected to qualifying the self-defense instruction as quoted above and objected to the court giving an instruction on second-degree manslaughter, on the grounds that self-defense is an intentional act, and that a shooting that is characterized as intentional can never be considered as wanton. The argument is that in any case where the accused's mental state (subjective belief) fits into the pigeonhole of self-defense, no matter how "wanton" her belief, she must be acquitted.

At the trial the respondent utilized as an "expert" witness a registered nurse with extensive experience in cases involving family violence in general and women who had been beaten by their husbands in particular. She was permitted to testify at length regarding the characteristics and consequences of the spouse abuse (battered wife) syndrome, presenting testimony explaining (1) why a wife stays with her husband despite the battering and (2) the reaction that follows. But she was not permitted to answer specifically as to whether in her opinion the accused was suffering from and reacting to that syndrome when she shot her husband. The trial court ruled, "that is for the jury to determine."

The Court of Appeals held that the trial court erred in refusing to permit the expert witness to express her ultimate conclusions as to this particular accused.

However, the Court of Appeals rejected the respondent's second argument, which was that no second-degree manslaughter

instruction was authorized because the theory of the defense was self-protection. The defense claims that the only proper options that should have been presented to the jury were intentional homicide (Murder or Manslaughter I) or acquittal, and that the conviction for wanton murder must result in an acquittal.

The Commonwealth asked for discretionary review of the Court of Appeals' decision that the trial court erred in refusing evidence that the accused was suffering from the spouse abuse syndrome. The respondent cross-appealed, claiming the Court of Appeals erred in remanding for a new trial since she should have been acquitted if not found guilty of Intentional Murder or Manslaughter I. The respondent claims that she cannot be retried for Wanton Homicide (Manslaughter II).

For reasons that will be stated we: (1) uphold that the trial court's decision to exclude the opinion offered by the registered nurse that the respondent was suffering from and reacting to the spouse abuse syndrome when she shot her husband, and (2) uphold the trial court's decision to qualify the self-defense instruction to allow for a finding of wanton conduct and Manslaughter II. Therefore, we reverse the Court of Appeals and affirm the verdict and judgment of the trial court.

## I. EXPERT TESTIMONY ON THE BATTERED WIFE SYNDROME

It is important to keep in mind that the trial court permitted the registered nurse who was offered as an expert witness to testify for the defense about the battered wife syndrome to explain and discuss the syndrome. This evidence was presented to the jury. The witness was not permitted to testify (1) that the accused was suffering from this syndrome, (2) that this syndrome would explain why she would not leave her mate and (3) why (in the witness' opinion) the accused believed that it was then necessary for her to kill in self-protection.

Thus the court permitted a limited use of expert testimony, but drew the line at permitting the witness to diagnose the accused's mental condition and to offer the conclusion that the accused believed that it was then necessary for her to kill her husband in self-defense.

In *Ford v. Commonwealth,* Ky., 665 S.W.2d 304, 309 (1984), we stated:

> "On the question of experts, it has long been the law of this jurisdiction that the decision as to the qualifications of an expert rests in the discretion of the trial court."

Thus the trial judge's decision as to whether a proposed witness is qualified to testify as an expert should not be disturbed unless it is "clearly erroneous." *United States v. Barker,* 553 F.2d 1013, 1024 (6th Cir.1977). This is the standard of review for both the decision permitting the witness to testify as an expert *and* the decision on the limits of the witness' expertise.

■ Inherent in the trial court's decision to permit the expert to testify as to the existence and nature of the battered wife (or spouse abuse) syndrome was a finding that this syndrome represents "scientific, technical, or other specialized knowledge [which] will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. In this case the witness provided background information sufficient to demonstrate the scientific acceptability of the battered wife (or spouse abuse) syndrome as a mental condition or entity generally recognized in the medical community. Thus, the case is distinguished from *Lantrip v. Commonwealth,* Ky., 713 S.W.2d 816 (1986), wherein expert testimony regarding the so-called "sexual abuse accommodation syndrome" was excluded because there was no evidence that the syndrome had obtained scientific acceptance or credibility among clinical psychologists or psychiatrists.

Further, it was reasonable for the trial court to conclude that evidence regarding this battered wife syndrome might be of assistance to the jury as trier of fact because it tends to explain why a person suffering from the syndrome would not leave her mate and would be driven by fear of continuing episodes of increased aggression against herself to perceive certain con-

duct was necessary in her self-defense, even though another person not suffering from such a condition might believe or behave differently. It was for this reason that the Georgia Supreme Court held that evidence of the "battered woman's syndrome" should be admitted in *Smith v. State*, 247 Ga. 612, 277 S.E.2d 678, 18 A.L.R.4th 1144 (1981). *See also*, Annot., 18 A.L.R.4th 1153–59 (1982), and supplemental ALR citations. We agree that, as a general proposition, evidence of this nature is admissible after a proper foundation has been provided by evidence that this is a mental condition constituting a recognized scientific entity and that the witness is qualified to testify about it.

■■■■ Nevertheless, the principal issue presented to us on review is not the admissibility of the subject matter, but the limitations placed by the trial court on the witness' testimony. The trial court refused to permit the witness to express opinions and conclusions that the accused was a person suffering from the battered wife syndrome and that this explained her state of mind as one of self-defense at the moment she pulled the trigger. We conclude that the trial court's ruling should be sustained against the charge of abuse of discretion on two grounds: (1) this was a registered nurse rather than a psychiatrist or clinical psychologist trained to diagnose mental conditions in specific individuals; and (2) the offer of testimony extended beyond a professional opinion regarding the accused mental condition to the ultimate question of the accused's state of mind at the time of the act, decisive of her guilt or innocence. As we explained in *Hampton v. Commonwealth*, Ky., 666 S.W.2d 737 (1984), either or both of these circumstances justify excluding the evidence.

In Kentucky we draw a distinction between testimony about the mental condition of an accused and "his actual mental attitude at a particular time and place." *Koester v. Commonwealth*, Ky., 449 S.W.2d 213, 215 (1970).

"It is the difference between an objective opinion and a subjective conclusion. [Citation omitted.] Or put another way, it is the difference between the mental abnormality and the specific 'product' produced thereby." *Id.*

The Federal Rules of Evidence have been recently revised to limit Rule 704 in line with the Kentucky rule. Formerly FRE 704(a) stated without qualification that "[t]estimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." It has been revised by adding the following qualification:

"(b) No expert witness testifying with respect to the mental state or condition of a defendant·in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto. Such ultimate issues are matters for the trier of fact alone." Amendment effective October 12, 1984, Pub.L. No. 98–473.

The trial court was within its discretion in deciding that this registered nurse, however experienced, was not qualified to diagnose the mental condition of the accused. It would be the same as permitting a nurse to provide a diagnosis as to whether an accused was suffering from a designated mental illness. Further, even if the witness were qualified to give a diagnosis, she was properly not permitted to express an opinion as to whether the accused believed it was necessary to shoot in self-defense at the moment she pulled the trigger.

## II.  INSTRUCTION ON MANSLAUGHTER II

■■■ The respondent was charged with murder but convicted of the lesser included offense of manslaughter in the second degree, KRS 507.040, which provides:

"A person is guilty of manslaughter in the second degree when he wantonly causes the death of another person."

The respondent claims that it was error to instruct the jury on Manslaughter II as a lesser included offense because she claims that she shot intentionally in a per-

ceived need for self-defense and "intentionally" and "wantonly" should be viewed as mutually exclusive mental states. Respondent cites *Gray v. Commonwealth*, Ky., 695 S.W.2d 860 (1985) as support for this contention.

Notwithstanding the language in *Gray*, there may be, as there is in this case, evidence supporting either view, self-defense or wantonness, depending on how the jury should view the evidence. Here it was reasonable for the jury to conclude that the accused shot the victim in a perceived need for self-protection but a wanton state of mind.

It is true that the use of physical force in self-protection is based on what "the defendant believes." KRS 503.050. But KRS 503.120(1) provides that when "such belief ... is wanton ... the justification afforded by [KRS 503.050] is unavailable in a prosecution for an offense for which wantonness ... suffices to establish culpability." Very often, as in this case, the fact of killing is unambiguous but the accused's mental state at the time of the killing presents a mixed picture.

KRS 501.020(1) provides that "[a] person acts intentionally with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause that result or to engage in that conduct."

KRS 501.020(3) provides that "[a] person acts wantonly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists ... [when] disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation."

A person who perceives a need to kill in self-defense when this perception is "a gross deviation from the standard of conduct that a reasonable person would observe in the situation" kills intentionally but also should be classified under KRS 501.020(3) as one who is "aware of and consciously disregards a substantial and unjustifiable risk that the result will occur." The Commentary states "wanton conduct involves conscious risk taking." Thus the same act should be classified as both intentional and wanton in that situation.

The act of killing in self-defense may be intentional, but it is not planned or premeditated. It is a reaction to existing or imminent use of force. KRS 503.050(1). When, viewed objectively, the act involves an excessive use of force which is grossly unreasonable and therefore culpable, it is punishable as wanton criminal behavior. This is the set of circumstances that KRS 503.050(1) and KRS 503.120(1), when read together, were designed to address. See the Commentary (1974) for the Penal Code, KRS Sections 503.050 and .120. The Code sets out, and the Commentary explains, that the need for self-defense must be viewed subjectively from the standpoint of the accused, not objectively from the standpoint of a reasonable person, but that the defendant who acts culpably in self-defense because his behavior, viewed objectively, is wanton, shall not go unpunished.

The holding in *Gray, supra,* while perhaps appropriate to the facts of that case, would be inappropriate to the present situation. Here, the jury could reasonably believe that this was a wanton killing to terminate what the accused subjectively believed to be an intolerable situation from which there was no other way out. The Penal Code was intended to provide Manslaughter II as a lesser homicide offense to murder to punish an unjustified killing under circumstances such as this which warrant a conclusion of diminished culpability, but do not warrant exoneration.

The evidence justified the trial court's instructions on Manslaughter II, and the jury's finding of guilty thereunder.

To the extent that *Gray* is in conflict with this decision, it is limited to its facts.

The decision of the Court of Appeals is reversed. The verdict of the jury and the judgment of the trial court is affirmed.

STEPHENS, C.J., and GANT, LAMBERT, LEIBSON and WINTERSHEIMER, JJ., concur.

VANCE, J., concurs by separate opinion.

STEPHENSON, J., concurs in results only.

VANCE, Justice, concurring.

I concur in the result in this case because the only conclusions which may be drawn from the evidence is that Mrs. Rose either shot her husband willfully and with the intent to kill him or that, if she did not actually intend to kill him, the act of shooting was wanton conduct because she is bound to have been aware of (and disregarded) the substantial risk that the shooting might result in death.

The case is easily distinguishable from *Gray v. Commonwealth,* Ky., 695 S.W.2d 860 (1985), because Mrs. Rose testified that although she shot her husband she did not intend to kill him. In *Gray, supra,* we held that the act of shooting under a claim of self-defense is, perforce, an intentional act. Nothing in the opinion in *Gray* indicates that any claim was made that the death of the victim was not intended. We concluded there was no evidence upon which the jury could determine that Gray's state of culpability was anything other than intentional.

In this case, Mrs. Rose provided testimony which would permit the jury to decide that she did not intend the death of her husband. She cannot now successfully contend that there was no evidentiary basis for the jury finding that the homicide was wanton rather than unintentional.