**STATE of Missouri,
Plaintiff–Respondent,**

v.

**Donna F. WILLIAMS,
Defendant–Appellant.**

No. 56395.

Missouri Court of Appeals,
Eastern District,
Division Three.

Feb. 20, 1990.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 28, 1990.

Application to Transfer Denied
May 15, 1990.

J. Justin Meehan, St. Louis, for defendant-appellant.

William L. Webster, Atty. Gen., Robert V. Franson, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

SMITH, Judge.

Defendant appeals from conviction by a jury of second degree murder and resultant sentence of twenty years imprisonment. We reverse and remand.

Defendant was charged and convicted of killing Joel Robinson with her automobile. The substituted information alleged first degree murder in that with deliberation defendant "knowingly attempted to cause the death of Louis Teague and in the course thereof actually caused the death of Joel Robinson by striking Joel Robinson with an automobile." The state does not dispute the applicability of, and the case was tried on, the theory of transferred intent. Under that concept although defendant did not kill the person she intended, her mental state for killing her intended victim is transferred to the ultimate victim and defenses she had to killing the intended victim transfer to the killing of the actual victim. *State v. Stallings*, 326 Mo. 1037, 33 S.W.2d 914 (1930) [2–4].

Commencing in 1983 defendant and Teague had had an ongoing intimate relationship for five years before the crime. Shortly after the commencement of that relationship defendant became pregnant with their child. Throughout the relationship defendant was employed and Teague usually was not. Teague was married, defendant was not. On at least ten and possibly as many as seventeen occasions defendant was beaten by Teague. At least one of these occasions involved a kick to the stomach while defendant was pregnant. Many of the beatings required medical treatment. On one occasion Teague required medical treatment after defendant hit him with a flower pot in attempting to defend herself. On one occasion while defendant and Teague were separated he entered her residence while she was gone and vandalized it. This included destroying a substantial amount of her furniture by throwing it out of the residence. Police told defendant that if she had been there Teague would have killed her. Teague pleaded guilty to burglary and vandalism and was placed on a year's probation. On another occasion Teague broke the windshield out of defendant's automobile. On one occasion (which may also have been the flower pot incident) while Teague was beating her, defendant picked up a knife but then decided against using it and put it down. Teague told her she should have killed him. Police were called on several occasions following beatings and following the windshield incident but other than the apartment episode Teague was always released without charges.

Defendant was hospitalized in 1985 for depression manifested by excessive drinking. Teague had both an alcohol and a drug problem. The couple lived together during the relationship on an on and off basis. Following some of the beatings defendant would evict Teague from her residence. She would subsequently allow him to return because of his indications of contrition, because she felt sorry for him, because he had nowhere to live, because he was out of work, because he had sustained a death in the family, because she believed he had or would change, and because she felt their daughter needed a complete family. She blamed his violent outbursts on alcohol and drugs.

On April 22, 1988, defendant worked from 2:30 p.m. to 11:00 p.m. Teague was to pick up their daughter from the babysitter and meet defendant at home. Teague had the only set of keys to the residence. Teague spent the day with friends, including Joel Robinson, drinking, using drugs and playing cards. Robinson and defendant were good friends and Robinson was a confidante of defendant in her problems with Teague. Defendant picked up the daughter when she found Teague had not done so. The child was with a man only slightly known to defendant having been

turned over to him by the babysitter. Defendant was upset about the potential harm that might have occurred to the child under the circumstances, although in fact the child was unharmed, and she blamed Teague for having failed to pick up the daughter.

Defendant located Teague at Robinson's residence and went there to get the keys. An argument ensued. Teague struck defendant in the face knocking her down the steps. He then struck her while she was on the ground. Defendant's glasses were knocked off. Robinson intervened to protect defendant and defendant escaped to her car. She was holding her glasses in her hand but did not put them on until after the subsequent events when she was some distance from the site. Without glasses defendant's vision is in the 20/400 range which would be reduced further at night and if she were crying. When she entered her car defendant was hysterical and crying.

As she was starting her vehicle Teague approached the automobile. Defendant pulled out and struck the vehicle ahead of her. The evidence is not clear whether this occurred as a result of defendant attempting to strike Teague. For purposes of this appeal we will assume it did. Unknown to defendant, Robinson had also entered the street as she pulled out and was caught between her vehicle and the one she sideswiped. This caused Robinson to fall into the street. Defendant observed a body lying in the street through her rear-view mirror. Believing that Robinson had never left the curb she assumed the body was that of Teague and that he was hurt as a result of her actions. Defendant recalled at that time that Teague had told her one time that if she ever hurt him she had better kill him, because if she didn't he would kill her. She said she observed the body get to its knees. Defendant then drove a short distance to an intersecting street, made a U-turn and drove over the body in the street. Until too late to avoid running over the body she believed the person in the street was Teague. She ran over the person in the street to prevent Teague from killing her. Robinson died as a result of being run over. Defendant left the scene but returned shortly thereafter, turned herself over to police, and gave a full confession essentially the same as the facts stated herein. We have set forth the facts in the light most favorable to the defendant because the issues raised require us to examine the facts in that light. Most of the salient facts are, however, undisputed.

Defendant, pursuant to Sec. 563.033 RSMo 1989 Supp., filed her timely notice of intent to offer evidence that she suffered from "battered spouse syndrome" as that pertained to a defense of self-defense. At a pre-trial hearing the court refused to allow such evidence on the basis that defendant was not married to Teague, was not a spouse, and such evidence was not therefore admissible. The trial court, following a disqualification of the motion judge, reaffirmed that ruling on the same basis. Both judges accepted as true the offer of proof made by the defendant of the facts and the expert opinions that defendant suffered from "battered woman syndrome." The matter was preserved throughout trial and post-trial. The court refused to give an instruction on self-defense or an instruction on manslaughter.

Sec. 563.033.1 provides: "Evidence that the actor was suffering from the battered spouse syndrome shall be admissible upon the issue of whether the actor lawfully acted in self-defense or defense of another." It is the province of the General Assembly of this state to establish the conduct which will subject its citizens or residents to criminal punishment. It is further within its province to establish the punishment which will flow from such transgressions. It is also within its province to establish the circumstances under which actions resulting in injury or death will be regarded as excusable or justifiable. We in the judiciary are bound by the actions of the legislative branch in making those determinations. By Sec. 563.031 RSMo 1986, the General Assembly has provided that self-defense is a justification for an otherwise felonious homicide. We will discuss the elements of that defense subsequently.

It is our obligation to apply the statutes as written and to determine from the language utilized their application in a given case.

The General Assembly has made the determination that evidence of the battered spouse syndrome and that the defendant is suffering therefrom is admissible on the issue of self-defense. It is the purpose of such evidence to explain to the lay jury the nature of the syndrome, its consequences, and its effect on the actor's mental state. This evidence is an aid to the jury in assessing the mental elements of self-defense. It is not necessary, therefore, for us to engage in the examination engaged in by other courts as to the scientific validity of the syndrome or its admissibility where self-defense is raised. *Ibn–Tamas v. U.S.*, 407 A.2d 626 (D.C.App.1979); *Buhrle v. State*, 627 P.2d 1374 (Wyo.1981).

We turn to whether application of the statute is dependent upon the marital status of the defendant. We note initially that the statute makes no requirement that only a spouse may utilize the evidence. The only reference to the person who may utilize it is "actor" a term which is both gender and marital-status neutral. We might presume that had the General Assembly intended the limit imposed by the trial court it would have utilized the phrase "a spouse" in place of "the actor" where the latter phrase appears in the statute.

The language refers to an actor "suffering from *the battered spouse syndrome.*" The emphasized language constitutes a specific medical or emotional condition bearing certain identifiable characteristics and arising from a specific source. In cases from other jurisdictions the term has been utilized interchangeably as "battered spouse syndrome", "battered wife syndrome" or "battered woman syndrome." *Ibn–Tamas v. U.S., supra,* (l.c. 631); *State v. Moore,* 72 Or.App. 454, 695 P.2d 985 (1985) (l.c. 986); *Commonwealth v. Rose,* 725 S.W.2d 588 (Tenn.1987) [1]. The syndrome has its identifiable origin in a book by Dr. Lenore Walker, a clinical psychologist, *The Battered Woman* (1979). Dr.

Walker describes a battered woman as follows:

> "... a battered woman is a woman who is repeatedly subjected to any forceful physical or psychological behavior by a man in order to coerce her to do something he wants her to do without any concern for her rights. Battered women include wives *or women in any form of intimate relationships with men.* Furthermore, in order to be classified as a battered woman, the couple must go through the battering cycle at least twice. Any woman may find herself in an abusive relationship with a man once. If it occurs a second time, and she remains in the situation, she is defined as a battered woman." (Emphasis supplied) *Id.* at XV.

Dr. Walker also specifically states that although in her discussion she refers to women as "wives" and men as "husbands" she does so in the interest of readability and "the battering relationship exists outside marriage, too." *Id.* Cases from other jurisdictions have recognized that the syndrome is not restricted to women in a marital relationship. *See, State v. Ciskie,* 110 Wash.2d 263, 751 P.2d 1165 (banc 1988) ftnt. 3 listing cases; *Commonwealth v. Stonehouse,* 521 Pa. 41, 555 A.2d 772 (1989). The syndrome identified by Dr. Walker has been referred to as the battered woman syndrome in other cases and in commentaries. *State v. Martin,* 666 S.W.2d 895 (Mo.App.1984) [10]; *Ibn–Tamas v. U.S., supra; Buhrle v. State, supra;* Comment, *A Woman, A Horse and a Hickory Tree: The Development of Expert Testimony on the Battered Woman Syndrome in Homicide Cases,* 53 UMKC Law Review 386; Mathes, *The Skeleton in the Closet: The Battered Woman Syndrome, Self–Defense, and Expert Testimony,* 39 Mercer L.Rev. 545. It is clear that neither Dr. Walker nor other courts and commentators have drawn any distinction between married and unmarried women as being subject to the syndrome.

Dr. Walker identified three phases to the battering cycle which vary in both time and intensity for the same couple and between different couples. The three phases are

the tension building phase, the explosion or acute battering incident and the calm-loving respite marked by loving, kind and contrite behavior on the part of the batterer. Retaliation by the woman usually occurs when the cycle lapses back into phase one from phase three.

"The death occurred after phase-one behavior began again. The women involved seemed to feel that they just could not cope with any further assaults. None of them stated she intended to kill her man; each said she only wanted to stop him from hurting her more." *The Battered Woman, supra* at 70.

Dr. Walker further explains that the reason why a victim chooses to stay in the relationship until she believes she is forced to kill or be killed is "learned helplessness." Basically, this theory states that when one learns through experience that one cannot escape a negative event, she ceases trying to escape even when the opportunity to do so is present. *Id.* 47. In describing cases where victims were tried for murder or assaults Dr. Walker noted:

"Several factors were common to all cases. First, each woman stated that she was convinced the batterer was going to kill her. Violent assaults had taken place previously in all of these cases. *In the final incident, however, something different was noted by these women which convinced them that the batterer really was going to kill them this time.*" (Emphasis supplied) (*Id.* at 220).

■ There appears to be no legitimate basis for concluding that the need of the battered woman to respond with deadly force to her perceived danger is dependent upon her marital status. To the degree that her "battered syndrome" constitutes a consideration in a self-defense defense claim it applies equally whether she is married or not. To deny equal treatment to such similarly situated individuals would present substantial problems under the equal protection clause. We should interpret a statute so as to avoid a constitutional confrontation if possible. We conclude that the term "battered spouse syndrome" used by the legislative body was a term of

art intended to describe the syndrome identified by Dr. Walker and was not intended as, and is not, a restriction based upon marital status. The basis upon which the trial court refused to admit evidence that defendant suffered from "battered spouse syndrome" was erroneous.

■ The state further asserts that the evidence was inadmissible in any event because the admitted conduct of defendant did not constitute self-defense. Sec. 563.-031 authorizes the use of physical force upon another person when and to the extent he reasonably believes such to be necessary to defend himself from what he reasonably believes to be the use or imminent use of unlawful force by such other person. The actor must reasonably believe further that deadly force is necessary to protect himself against death, serious physical injury, rape, sodomy, or kidnapping before deadly force can be used.

*State v. Chambers,* 671 S.W.2d 781 (Mo. banc 1984) [1–3] identified the elements of self-defense as follows:

"Deadly force may be used in self-defense only when there is (1) an absence of aggression or provocation on the part of the defender, (2) a real or apparently real necessity for the defendant to kill in order to save himself from an immediate danger of serious bodily injury or death, (3) a reasonable cause for the defender's belief in such necessity and (4) an attempt by the defender to do all within his power consistent with his personal safety to avoid the danger and the need to take a life."

■ In the absence of the "battered spouse syndrome" it is clear that defendant established only the first element of the defense. But if the evidence of the syndrome is to have any meaning under Sec. 563.033 it must be as a modification of the mental state required of the battered woman. More accurately stated it is that the syndrome creates a perception in the battered woman so that as to her the required elements have been met. As stated in *Commonwealth v. Stonehouse, supra* [7] the evidence is to be weighed by the jury in light of how the reasonable *battered wom-*

*an* would have perceived and reacted in view of the prolonged history of physical abuse. The courts have generally accepted the utilization of evidence of the syndrome where the killing occurs during or immediately after a battering incident. *Buhrle v. State, supra* (1.c. 78); *Ibn–Tamas v. U.S., supra; Commonwealth v. Stonehouse, supra; State v. Martin, supra. But see: State v. Norman,* 324 N.C. 253, 378 S.E.2d 8 (1989), which narrowly restricts "immediately after."

■ Here, defendant's actions occurred immediately after the beating while she was hysterical and crying. It occurred after she believed she had injured Teague and had in her mind his prior warning that if she hurt him she had better kill him or he would kill her. This was a different situation than that noted in the previous battering incidents and caused defendant to believe she would be killed this time. A distinctive characteristic of the syndrome is the battered woman's belief that there is no escape from the batterer and the batterings. We believe that under these facts and circumstances the issue of self-defense would be a question for the jury once it had the evidence of the "battered spouse syndrome" before it. The expert evidence provided by the defendant in her offer of proof and accepted as true by the trial court for purposes of its ruling in limine reflected that defendant's condition closely tracked the battered women's syndrome identified and explained by Dr. Walker. The evidence rejected was necessary for a jury to understand the defendant's perceptions of her situation, particularly her feelings that no escape was possible, and her resultant conclusion that killing Teague was an act of self-defense. We find it was error for the court to deny defendant the opportunity to present evidence that she was suffering from battered spouse syndrome and the cause must be reversed and remanded for new trial.

Defendant also premises error on the failure of the trial court to give an instruction on manslaughter. We address this issue as it may arise on retrial. Sec. 565.-023, RSMo 1986, provides:

"A person commits the crime of voluntary manslaughter if he:

(1) Causes the death of another person under circumstances that would constitute murder in the second degree under subdivision (1) of subsection 1 of section 565.021, except that he caused the death under the influence of sudden passion arising from adequate cause;."

■ If there is some evidence that defendant caused the death under the influence of sudden passion arising from adequate cause it is reversible error to fail to give a manslaughter instruction. *State v. Newlon,* 721 S.W.2d 89 (Mo.App.1986) [1]. Unless we can declare as a matter of law that sudden passion from adequate cause was not the cause of the death we must reverse. *State v. Ayers,* 470 S.W.2d 534 (Mo. banc 1971); *State v. Patterson,* 484 S.W.2d 278 (Mo.1972); *State v. Newlon, supra.*

"Sudden passion" is "passion directly caused by and arising out of provocation by the victim or another acting with the victim which passion arises at the time of the offense and is not *solely* the result of former provocation." Sec. 565.002(7), RSMo 1986 (Emphasis supplied). "Adequate cause" is "cause that would reasonably produce a degree of passion in a person of ordinary temperament sufficient to substantially impair an ordinary person's capacity for self-control." Sec. 565.002(1). Under the doctrine of transferred intent, heretofore discussed, defendant's state of mind as to the sudden passion element is determined by the actions of her intended victim, Teague.

■ It would appear that no question could be raised that Teague's actions constituted adequate cause for a sudden passion in defendant sufficient to support a manslaughter instruction. The only question is whether sufficient time had elapsed after the beating and before defendant ran over Robinson to say as a matter of law that the sudden passion had subsided and was no longer the cause of defendant's conduct. We are unable to so conclude. Defendant's evidence was that she was hysterical and crying from the time of the

beating until she ran over Robinson and in fact her hysteria continued thereafter. The record does not establish the time that elapsed between the beating and the run-down but from the description of the occurrence and the distances involved the time was short. The issue was one of fact for the jury and the court erroneously refused to give the manslaughter instruction.

Judgment of conviction reversed and cause remanded for new trial.

SATZ, P.J., and GRIMM, J., concur.