**STATE of Missouri,
Plaintiff/Respondent,**

**v.**

**John A. WORRALL,
Defendant/Appellant.**

**No. ED 87162.**

Missouri Court of Appeals,
Eastern District,
Division Four.

Feb. 27, 2007.

Motion for Rehearing and/or Transfer to
Supreme Court Denied April 12, 2007.

Application for Transfer Denied
May 29, 2007.

Kent Denzel, Columbia, MO, for appellant.

Shaun J. Mackelprang, Roger Johnson, co-counsel, Jefferson City, MO, for respondent.

SHERRI B. SULLIVAN, J.

*Introduction*

John Worrall (Defendant) appeals from his judgment of conviction, following a jury trial, for voluntary manslaughter in violation of Section 565.023;[1] armed criminal action in violation of Section 571.015; and possession of a controlled substance in violation of Section 195.202. The trial court sentenced Defendant to concurrent terms of imprisonment for fifteen years, life, and five years, respectively. We affirm.

*Background*

Defendant, a Jamaican who emigrated from London, was charged with first-degree murder, armed criminal action, and possession of over thirty-five grams of marijuana, in connection with the shooting death of his girlfriend, Crystal Hutchison (Victim).

According to Defendant's testimony at trial, on July 13, 2002, he was lying on his bed when heard a window break. He did not get up to check on the noise because he figured it was Victim; he heard Victim go into his bathroom, and Victim thereafter appeared in his room with gun. Victim pointed the weapon at Defendant, hit him with her elbows, demanded money for dia-

pers, and said, "You know I will shoot you." She then went to Defendant's closet to search his clothes for money, laying the gun down in the closet. When she found only fifteen dollars, she told him it was not enough and started hitting Defendant.

Defendant got up from the bed to stop Victim from hitting him. Victim went to get the gun. Defendant tried to prevent her from getting the gun and the two started fighting for the gun in the closet. Victim dropped the gun. Defendant got on top of Victim and they struggled over the gun. Defendant held on to the gun as they fought over it; after he heard a "pow," he pulled the gun away. When he dropped the gun, he and Victim both stood. When Defendant saw Victim come out of the closet and look at the gun, he ran out of the house.

Defendant went to the police station. According to Defendant, he told the police that he thought only one shot was fired, but they later told him that six shots were fired and that Victim was dead.

Shawn Lane (Lane), an officer with the Jennings Police Department, testified that when Defendant arrived at the police station, he was visibly distraught. After determining that someone had been shot, Lane and several other officers proceeded to Defendant's house. When Lane approached Defendant's bedroom, he saw a large amount of blood on the bed's mattress and observed Victim, covered with blood, lying on the floor with a revolver underneath her left arm. Two or three minutes later, paramedics arrived, and Victim was pronounced dead.

Raj Nanduri, a forensic pathologist, testified that Victim had been shot four times, twice from a distance of at least two feet, and twice at close range. One bullet went through her lower breast and scraped her

---

1. All statutory citations are to RSMo 2000, unless otherwise indicated.

arm. Another hit her upper arm and fragmented the bone. Another bullet hit Victim in the back of her chest, just under the left arm. Another bullet entered Victim's upper chest on the left side, went through her left lung, tore her pericardium, and hit her right lung before exiting Victim's body; this injury was inflicted with the gun's muzzle pressed against Victim's chest and would have resulted in death within two minutes.

Defendant testified that he was scared of Victim because they had "been through so many problems." When Victim visited him at his house, she would play music loudly, although she knew that Defendant did not like loud music. He stated that Victim attacked him on several occasions, breaking out the windows in his house, chasing him with a car, throwing a brick at him, threatening him with a knife, spraying him with an aerosol can, and hitting him with her shoes. Despite these behaviors, Defendant loved Victim, and wanted to be with her and their baby. Sometimes, to avoid Victim, Defendant would stay away from home or not answer the telephone or door.

One of Defendant's neighbors, Torrey Handy (Handy), testified that he had seen Defendant and Victim arguing, but he could not tell what the argument was about or who the aggressor was. Handy believed the couple's relationship was violent.

Stephanie Hall, a friend of Defendant and Victim, testified that a few days before the incident, Victim got upset during an argument with Defendant because he was ignoring her, and Victim retrieved a knife from the kitchen and attempted to attack Defendant.

Before trial, Defendant endorsed Dr. Thomas Conran as an expert witness and filed notice of his intent to introduce evidence of Battered Spouse Syndrome. The State filed a motion to exclude Dr. Conran's testimony.

During a hearing on the State's motion, Dr. Conran testified that, while Defendant did not fit any of the named categories in the Diagnostic and Statistical Manual (DSM IV), Defendant did suffer from a mental disease or defect not listed in the DSM IV. Dr. Conran stated that Defendant did not suffer from Battered Spouse Syndrome, as originally defined, but that "the facts of the case, would indicate mutual combat, mutual aggressiveness." In place of the learned helplessness exhibited by battered women, Defendant exhibited hyper-defensiveness, which is commonly associated with acts of responsive aggressiveness.

Upon questioning by the court, Dr. Conran opined that Defendant suffered "from what would be considered a more male-oriented version [of Battered Spouse Syndrome] that could be clearly and rationally classified as mutual combat." When asked if that version of the battered spouse syndrome was recognized in the psychiatric community, Dr. Conran replied that there was very little consensus as to how to understand men when they were the victims of aggression who also acted out aggressively in their families. He summarized Defendant's situation by stating:

> Many women nowadays are much more assertive than they were 20 years ago and I doubt he'd met anyone as assertive in a foreign country as an American woman. He was utterly unprepared, due to his mental problems and the cultural difference, could not handle an assertive young lady, eventually grew defensive, tried to escape from her, hide from her, she pursued him, a gun was brought into the situation, he grew irate over this, defensive, sadly she died and was killed.

The trial court granted the State's motion to exclude Dr. Conran's testimony, specifically finding that Dr. Conran testified that Defendant did not suffer from a disease or defect defined in the DSM IV and did not suffer from Battered Spouse Syndrome. During his case in chief, Defendant made a narrative offer of proof, stating that Dr. Conran would testify that Defendant suffered from a form of Battered Spouse Syndrome called mutual combat. The trial court declined to reverse its ruling excluding Dr. Conran's testimony.

During the instruction conference, the trial court gave Defendant the opportunity to object to each of the instructions submitted by the State, and Defendant indicated that he had no objections to the offered instructions. When asked if he had any other instructions to tender or any objections to place on record, Defendant stated that he had none.

As pertinent to the issues on appeal, the jury was instructed on first-degree murder, second-degree murder, voluntary manslaughter, and involuntary manslaughter. All of these instructions were modified to include the issue of self-defense, as defined in MAI–CR3d 306.06. The jury was also instructed on armed criminal action and possession of a controlled substance.

At the close of trial, the jury returned verdicts finding Defendant guilty of voluntary manslaughter, armed criminal action, and possession of more than 35 grams of marijuana.

In his motion for new trial, Defendant claimed the trial court erred in excluding Dr. Conran's testimony because Dr. Conran would have testified that Defendant "suffered from a mental disease or defect and that the Defendant suffered from mutual combat which is a form of Battered Spouse Syndrome."

*Point on Appeal*

In his sole point on appeal, Defendant claims the trial court abused its discretion in refusing to permit, during the guilt phase of Defendant's trial, Dr. Conran's testimony that Defendant suffered from a form of Battered Spouse Syndrome, more common among males, called "mutual combat." Defendant contends this evidence was admissible pursuant to Section 563.033 on the issue of self-defense.

*Standard of Review*

The decision to admit expert testimony is a matter of trial court discretion which will not be overturned absent an abuse of that discretion. *State v. Copeland,* 928 S.W.2d 828, 837 (Mo. banc 1996).

*Discussion*

Section 563.033 provides, as relevant, that evidence that an individual suffers from Battered Spouse Syndrome shall be admissible upon the issue of whether the individual lawfully acted in self-defense.

Battered Spouse Syndrome "constitutes a specific medical or emotional condition bearing certain identifiable characteristics and arising from a specific source." *State v. Williams,* 787 S.W.2d 308, 311 (Mo.App. E.D.1990). This court has concluded that Battered Spouse Syndrome, as used by the Missouri legislative body in Section 563.033, is "a term of art intended to describe the syndrome identified by Dr. [Lenore] Walker." *Id.* at 312.

Dr. Walker stressed that for an individual to be classified as battered, the couple must go through the battering cycle at least twice. *Id.* at 311. This battering cycle consists of three phases: 1) the tension-building phase; 2) the explosion or

acute battering incident; and 3) the calm-loving respite marked by loving, kind and contrite behavior by the batterer. *Id.* at 311–12. Retaliation by the battered individual usually occurs when the cycle lapses back into phase one from phase three. *Id.* at 312. Dr. Walker explained that the battered spouse's choice to remain in the relationship until that spouse believes she is forced to kill or be killed is due to "learned helplessness;" the battered spouse learns through experience that she cannot escape, so she stops trying to escape even when she has the opportunity. *Id.* at 312.

We conclude that Dr. Conran's testimony offered during the hearing on the State's motion to exclude failed to show that Defendant's condition closely tracked Battered Spouse Syndrome as identified and explained by Dr. Walker. Neither Dr. Conran nor the Defendant provided testimony indicating the presence of all three phases of the battering cycle, much less evidence that the couple went through the battering cycle at least twice prior to the shooting. The evidence here shows that the shooting took place during a violent encounter precipitated by Victim, not during a lapse between a loving respite and a tension-building phase. Furthermore, the "learned helplessness" element for which testimony is needed to explain why a battered spouse does not leave a violent relationship and why she believes she is forced to kill is absent. The rejected evidence would not assist the jury in understanding Defendant's perceptions of the situation and his conclusion that killing Victim was an act of self-defense.

The trial court's decision was not an abuse of discretion. Point denied.

### Conclusion

The judgment of the trial court is affirmed.

ROY L. RICHTER, P.J., and KATHIANNE KNAUP CRANE, J., concur.